Pete NICACIO, et al.,
Plaintiffs-Appellees,

v.

UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE, et al.,
Defendants-Appellants.

No. 84–4074.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 1985.

Decided Aug. 16, 1985.

Amended Aug. 19, 1986.

Daniel G. Ford, Granger, Wash., for plaintiffs-appellees.

Lauri Steven Filppu, Thomas W. Hussey and Marshall Tamor Golding, Washington, D.C., for defendants-appellants.

Before GOODWIN, SCHROEDER, and BEEZER, Circuit Judges.

SCHROEDER, Circuit Judge.

The Immigration and Naturalization Service appeals from a judgment of the district court which concluded that the INS was engaged in a pattern of unlawful stops to interrogate persons of Hispanic appearance traveling by automobile on Washington highways. It declared stops without a warrant unlawful unless the agents have a "particularized reasonable suspicion based on specific articulable facts" that a person in the vehicle is an illegal alien. *Nicacio v. INS,* 595 F.Supp. 19, 26 (E.D. Wash.1984). The judgment further ordered INS agents to keep a record of each stop and state the reasons for it.[1]

The district court certified a plaintiff class which included "[a]ll persons of Mexican, Latin, or Hispanic appearance who have been, are, or will be traveling by motor vehicle on the highways of the State of Washington." *Id.* at 21. It entered judgment after hearing considerable testi-

---

1. The operative portions of the court's judgment are:

    1. IT IS HEREBY ORDERED:

It is unlawful for the United States Immigration and Naturalization Service, its agents and employees and Border Patrol agents: To stop, detain, and interrogate persons of Hispanic appearance travelling by motor vehicle on the highways of the State of Washington without a valid search or arrest warrant, or unless they have a particularized reasonable suspicion based on specific articulable facts and rational inferences therefrom that the occupant of a vehicle is an alien unlawfully in the United States. Further, these specific articulable facts justifying the motor vehicle stops must be based upon particularized objective factors, and not solely upon the agents' individual subjective impressions.

    2. IT IS FURTHER ORDERED that the United States Immigration and Naturalization Service, its agents and employees and Border Patrol agents: Shall not stop, detain, and interrogate persons of Hispanic appearance travelling by motor vehicle on the roadways of the State of Washington without documenting in writing the specific articulable facts on which defendants base their particularized reasonable suspicion for stopping, detaining and interrogating these persons. Defendants shall maintain this documentation for a period of not less than three years.

mony from representatives of the class and the INS. This judgment came after the same district court had enjoined the INS from conducting farm and ranch checks of migrant farm housing without a warrant or articulable suspicion. *See LaDuke v. Nelson,* 560 F.Supp. 158 (E.D.Wash.1982). We affirmed the injunction in that case, *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir. 1985), and we affirm here as well.

The INS raises two issues on appeal. The first is whether sufficient basis existed in law and in fact to support the district court's conclusion that the INS had engaged in a practice of detaining members of the plaintiff class, while they were traveling on the highways, without an articulable suspicion of illegal alienage as the law requires. The second issue, related to the first, is whether the district court was justified in requiring the border patrol to document the basis for future vehicular stops.

Before dealing with the issues raised by the appellants, however, we discuss briefly two matters which the appellants do not raise as grounds for reversal but which we find necessary for a proper understanding of the controversy before us.

■ The first is the question of standing in light of the Supreme Court's decision in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). There, the Court held that a plaintiff, who was subjected once by a police officer to a "chokehold," lacked standing to seek an injunction against future use of such a hold because the possibility of his being injured in the future was purely speculative. *Id.,* 461 U.S. at 111, 103 S.Ct. at 1670, 75 L.Ed.2d 675. In *LaDuke,* we discussed standing in a context similar to this one, and we upheld plaintiffs' standing. *LaDuke,* 762 F.2d at 1326.

Here, as in *LaDuke,* and unlike *Lyons,* the district court found that the government's conduct was both recurrent and in violation of the plaintiffs' constitutional rights. Here, too, federal courts are dealing with conduct of federal agents; there is no threat of federal entanglement with state processes. Moreover, as in *LaDuke,*

we look not merely to the possibility of injury to one individual, but to the foreseeability of harm to members of an entire class. In the light of our opinion in *LaDuke,* there can be no remaining question concerning standing in this case. This is, in fact, an even stronger case than *LaDuke,* for here the district court found that several of the plaintiff class members had actually experienced repeated stops which the court found to have been violative of their rights. The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented. This may account for the government's disinclination even to argue standing in this case.

■ The second subject, which is not directly in issue but which we should discuss, is the legal standard for warrantless vehicular stops by immigration agents on roving patrols. Stops of persons traveling in automobiles are "seizures" within the meaning of the fourth amendment. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Thus, persons traveling in cars are entitled to some protection under the fourth amendment. As the district court stated in this case, "[i]ndividuals in automobiles traveling on this nation's highways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of law enforcement officials." *Nicacio,* 595 F.Supp. at 23. Immigration agents on a roving patrol may stop a vehicle only when they have a reasonable suspicion based on specific and articulable facts that the vehicle contains aliens who may be illegally in this country. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *United States v. Medina-Gasca,* 739 F.2d 1451, 1453 (9th Cir.1984); *United States v. Ogilvie,* 527 F.2d 330, 331 (9th Cir.1975).

As we stated in *United States v. Rocha-Lopez,* 527 F.2d 476 (9th Cir.1975), *cert. denied,* 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976), the "articulable facts"

forming the basis of a reasonable suspicion are "measured against an objective reasonable man standard, not by the subjective impressions of a particular officer." *Id.,* 425 U.S. at 477, 96 S.Ct. at 2181 (quoting *United States v. Mallides,* 473 F.2d 859, 861 (9th Cir.1973)). The reasonable suspicion test has been applied in a variety of circumstances. *E.g., United States v. Munoz,* 604 F.2d 1160 (9th Cir.1979) (vehicles traveling in tandem with drivers appearing to be of Mexican or Latin extraction and failure of occupants to look at the agents is not reasonable suspicion); *Medina-Gasca,* 739 F.2d at 1453 (two heavily laden vans, traveling in tandem on a known smuggling route, which dispersed from a roadside stop when an officer approached on foot supported a finding of reasonable suspicion).

*Brignoni-Ponce* and its progeny make clear that Hispanic-looking appearance and presence in an area where illegal aliens frequently travel are not enough to justify a stop to interrogate the occupants of a vehicle. More is required. 422 U.S. at 884–87, 95 S.Ct. at 2582–83, 45 L.Ed.2d 607.

*Were Plaintiffs Subjected to a Pattern of Vehicular Stops Without a Reasonable Suspicion of Illegal Alienage?*

The INS challenges the district court's interpretation of the reasonable suspicion standard, and requests that we review that interpretation de novo as a matter of law. The INS also challenges the sufficiency of the evidence supporting the district court's finding that there was a pattern of stops under the circumstances described by the district court. This is reviewable as a question of fact under the clearly erroneous standard. *LaDuke,* 762 F.2d at 1321; *United States v. McConney,* 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Evaluating these challenges necessitates a review of the record.

The evidence concerned INS stops conducted primarily in the central part of the State of Washington. All parties agree that this is an agricultural area requiring a large amount of seasonal agricultural field labor. That labor force is composed mainly of persons of Hispanic appearance and Mexican heritage, although it is a mixture of United States citizens, legal aliens and illegal aliens. The INS concentrated its efforts during the seasons when the demand for labor was the greatest, because the number of illegal aliens in the area increases during those periods, and there are large numbers of field workers traveling on the roads and highways in central Washington in various types of vehicles.

Twenty-two plaintiff class members, including a United States citizen of German extraction, testified that INS agents stopped them while they were driving on central Washington highways. They testified that neither they nor their companions were illegal aliens. Most testified specifically about the location of the stops, the approximate time of day of the stops, and the circumstances surrounding the stops. Three testified that they had been stopped more than once. The evidence indicates that the INS was aware that persons lawfully in this country were being detained. One witness, for example, testified that an INS agent told him "we are going to be working through here, through this highway here, if we stop you again ... don't get mad."

Most of the witnesses had been detained while traveling in groups with other workers and in older automobiles. None knew of any specific circumstance or suspicious behavior of the occupants of the automobile that might have caused the stop. Most of the witnesses testified that they knew of no reason for being stopped other than their appearance. One witness testified that the INS officers told him they had stopped his car "because there were three of them [in the car]."

The INS presented the testimony of several agents about the basis on which stops are typically made. The INS agents did not, however, testify about the specific instances alleged by plaintiffs because the plaintiffs' witnesses could not testify as to the names of the officers who stopped them, and because the INS kept no records

of stops which did not result in arrests. The agents did attempt, however, to articulate the factors, in addition to Hispanic appearance, that they found suspicious.

The Chief Patrol Agent for the INS's "Spokane Sector" testified that in his practice, he relied upon a person's appearance to substantiate "reasonable suspicion" so long as it was "not strictly Hispanic appearance." He said an officer could rely, along with Hispanic appearance, on a "hungry look," or a person's age. Other appearance or dress factors which agents testified they relied on, in addition to Hispanic appearance, were a "dirty, unkempt appearance," the "lean and hungry look," and the fact that a person wears work clothing. An example of clothing which one agent testified he considered was a "bumper cap." There was evidence, however, that both legal and illegal aliens wear the caps.

■ Several agents testified that they would stop a vehicle if it contained a number of people of Hispanic appearance, dressed in work clothes, traveling early in the morning. In the words of the district court, the INS agents stopped many vehicles "under circumstances in which the occupants were of Hispanic appearance, dressed in work clothes and operating older automobiles. In most instances these stops were made during the active labor season at the time of day when the field workers would be going to or from work." 595 F.Supp. at 23. The record shows these characteristics were shared by citizens and legal aliens in the area, as well as illegals. As the district court found, the appearance and dress factors relied upon by the agents "are a function of the individual's socioeconomic status." They cannot be relied upon, without other objective facts, to support the decision to stop a vehicle. *Id.* at 24; *see also Ramirez v. Webb*, 599 F.Supp. 1278, 1284 (W.D.Mich.1984). There is nothing in this record which demonstrates that any of these factors alone or in combination with each other made it more likely that the persons detained as opposed to others using the highway in the area, were illegal aliens. We do not hold that these factors are irrelevant as a matter of law, but only that their probative value is so weak that unless they are combined with other more probative factors or occur in circumstances that substantially enhance their usual significance, they are insufficient to provide a rational basis for stopping vehicles to search for illegal aliens.

■ Several agents testified that they considered behavioral factors, such as an alien's refusal to look them in the eye, as suspicious. We have held, however, that lack of eye contact is not an appropriate factor to consider because it is not indicative of illegal alienage. *See Munoz*, 604 F.2d at 1161 ("The failure of the occupants to look at the agents adds little to the case in light of the questionable value of the factor generally ...."); *Mallides*, 473 F.2d at 861 (conduct not suspicious simply because the occupants of an automobile "do not look at a passing police car."); *see also United States v. Lamas*, 608 F.2d 547, 549–50 (5th Cir.1979) (avoiding eye contact cannot weigh in balance whatsoever); *United States v. Lopez*, 564 F.2d 710, 712 (5th Cir.1977) (failure to make eye contact may be the rule rather than the exception). Although routine reliance on lack of eye contact is inappropriate, we also recognize that special circumstances may make innocent avoidance of eye contact improbable and thus a factor contributing to a reasonable suspicion justifying a stop. *United States v. Nikzad*, 739 F.2d 1431, 1433 (9th Cir.1984) (avoidance of eye contact with officer probative after suspect looked at officers and noticed they were looking at him); *United States v. Vasquez-Cazares*, 563 F.2d 1329, 1330 (9th Cir.1977) (per curiam) (avoidance of eye contact somewhat probative when marked police car is directly in line of vision).

■ The district court found that many of the stops were based on "the agents' subjective feelings or intuition." 595 F.Supp. at 21. These findings are amply supported by the record and cannot be deemed clearly erroneous. One agent, for example, in trying to explain why he makes

stops based on clothing, testified "this is where you are getting into the experience part and there is times when I can tell the difference, but I cannot tell you why." Another testified that he can distinguish documented from undocumented aliens because "[w]e have been around ... and just from experience we can tell who is illegal and who is not. Sometimes it's an air about a person or the way he looks, or carries himself, but it's kind of hard to just say right off ...."

We agree with the district court that such subjective feelings do not provide any rational basis for separating out the illegal aliens from American citizens and legal aliens. Reliance on such subjective feelings therefore does not meet the *Brignoni-Ponce* requirement that stops be based on "specific articulable facts, together with rational inferences from those facts...." 422 U.S. at 884, 95 S.Ct. at 2582, 45 L.Ed.2d 607; *see also Cortez*, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d 621; *Rocha-Lopez*, 527 F.2d at 477.

The INS argues that the district court incorrectly interpreted the "reasonable suspicion" requirement. According to the INS, the district court erred in giving no weight to the officers' subjective reactions. Relying on the observation in *Brignoni-Ponce* that officers are "entitled to assess the facts in light of [their] experience in detecting illegal [aliens]," 422 U.S. at 885, 95 S.Ct. at 2582, 45 L.Ed.2d 607, the INS contends that objective Hispanic appearance can be coupled with an agent's hunch, drawn from past experiences, to meet the requisite standard of reasonable suspicion.

This position is untenable in light of the holding of *Brignoni-Ponce* that specific articulable facts, together with rational inferences from those facts, must provide a reasonable suspicion of illegal alienage. An agent's experience might make a situation suspicious to him which to the untrained or inexperienced eye would pass unnoticed or seem innocent. *See Cortez*, 449 U.S. at 419, 101 S.Ct. at 695–96, 66 L.Ed.2d 621 ("objective facts, meaningless to the untrained, can be combined with

permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion."). Such "permissible deductions," *id.*, or "rational inferences," *Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582, 45 L.Ed.2d 607, must, however, flow from objective facts and be capable of rational explanation. While an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop. We therefore agree with the district court's statement that

> the detaining officers must have a particularized and *objective* basis for suspecting the particular person stopped to be an illegal alien. Border Patrol officers may not lawfully stop motorists for questioning on a roving patrol without reason to believe that a particular vehicle is carrying illegal aliens. The articulable facts standard is "measured against an objective reasonable man standard, not by the subjective impressions of a particular officer."

*Nicacio*, 595 F.Supp. at 22 (quoting *Rocha-Lopez*, 527 F.2d at 477) (citations omitted) (emphasis in original). The district court applied the proper legal standard.

■ The INS also suggests that plaintiffs failed, as a matter of law, to prove that many of the stops ever occurred. Their argument is, to the extent we understand it, that many of the plaintiffs' inability to remember the exact date of their alleged stops or the names of the officers who stopped them required the district court to disregard all of those plaintiffs' testimony. The weight to be given testimony in light of a witness' inability to remember specific details is generally reserved to the judgment of the finder-of-fact. To the extent it bears on credibility, the district court has great discretion in deciding whether to credit a witness' testimony. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512–13, 84 L.Ed.2d 518 (1985). The district court

made careful credibility findings and concluded:

the Court is left with undisputed testimony which indicates that numerous stops were made solely because of the Hispanic appearance of the occupants, the type of automobile and/or the time of day and year. I carefully observed the witnesses as they testified and am completely satisfied that they were being honest and candid in their testimony and sincerely believed that they were stopped solely because of the factors indicated.

*Nicacio,* 595 F.Supp. at 23.

We cannot find any fault in the district court's meticulous evaluation of the evidence.

### The Requirement That the INS Document the Basis for Future Stops

■ The INS challenges the district court's order that it document the basis for future stops on the grounds that such documentation is excessively intrusive and burdensome. The order was in the nature of an injunction, and the issue is whether the order falls within the wide discretion which the court enjoys in exercise of its equitable powers. *See Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973); *Handler v. SEC,* 610 F.2d 656, 659 (9th Cir.1979). In fashioning this order, the district court rejected the plaintiffs' far stronger demand that the court directly enjoin any unconstitutional stops, thereby making any future stops automatically subject to contempt proceedings.

The record belies the INS contention that the ordered record keeping is excessively burdensome. The INS Manual M–69, *The Law of Arrest, Search, and Seizure for Immigration Officers,* is part of this record. It provides that an officer who "detains an individual ... must be prepared to state what the facts and inferences were on which the suspicion leading to the contact was based...." Agents testified that in their view, this provision mandates a record only in those cases where there is an arrest or seizure of property. Nothing in the Manual, or elsewhere in the record, however, indicates that some record keeping of the basis for all stops is contrary to policy or would interfere with an agent's other duties. In fact, the record indicates that in at least one other sector, located in Montana, officers are required to make a record of all stops, even those in which no one is apprehended. Moreover, defendants' counsel directly asked the Chief INS Agent for the Spokane Sector whether a record keeping requirement, similar to that employed in Montana, would entail extra record keeping for his agents. He testified only that it would take "a little bit more" work.

On the basis of this record, the order in question cannot be considered an abuse of discretion. Indeed, it is difficult to imagine a remedy that would be less burdensome to the government and at the same time serve in any way to prevent future constitutional violations. *See INS v. Lopez-Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), where the Court, in rejecting the application of the exclusionary rule in deportation proceedings, encouraged courts to consider alternative methods for reviewing the validity of INS practices. *See also LaDuke,* 762 F.2d at 1330.

■ We observe, finally, that a court which issues an injunction retains jurisdiction to modify the terms of the injunction if a change in circumstances so requires. Fed.R.Civ.P. 60(b)(6); *see System Federation No. 91, Railway Employees' Department, AFL–CIO v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *Anderson v. Central Point School District No. 6,* 746 F.2d 505, 507 (9th Cir.1984); *Lapin v. Shulton, Inc.,* 333 F.2d 169, 170 (9th Cir.), *cert. denied,* 379 U.S. 904, 85 S.Ct. 193, 13 L.Ed.2d 177 (1964); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2961 (1973). Whatever burdens the order does impose cannot be regarded as inflexible.

The judgment of the district court is affirmed.