199 F.3d 1037 (9th Cir. 1999)
 PANCHITA HODGERS-DURGIN, individually and on behalf of all others similarly situated; ANTONIO V. LOPEZ, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
GUSTAVO DE LA VINA, in his official capacity; RONALD E. SANDERS, in his official capacity; STEPHEN NORMAN, in his official capacity, Defendants-Appellees.
 No. 97-16449
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted June 24, 1999--San Francisco, California
Filed December 21, 1999
 
 Armand Salese, Salese and McCarthy, Tucson, Arizona, and William E. Morris, Arizona Justice Institute, Tucson, Arizona, for the plaintiffs-appellants.
 Robert M. Bombaugh, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; John M. Roll, District Judge, Presiding. D.C. No. CV-95-00029-JMR
 Before: Chief Judge Procter Hug, Jr., Joseph T. Sneed, Stephen Reinhardt, Melvin Brunetti, Stephen S. Trott, Pamela Ann Rymer, Thomas G. Nelson, Andrew J. Kleinfeld, Sidney R. Thomas, Barry G. Silverman, and William A. Fletcher, Circuit Judges.
 W. FLETCHER, Circuit Judge:
 
 
 1
 The question in this case is whether two individual plaintiffs may bring a class action for equitable relief against officials of the United States Border Patrol who supervise operations along the Mexican borderin the state of Arizona. Plaintiffs, who each were stopped once by Border Patrol agents, contend that the stops violated the Fourth Amendment's prohibition against unreasonable seizures. They seek equitable relief, asking in their complaint for a declaratory judgment that "the roving patrol operations [of the Border Patrol] involve systemic violations of the Fourth Amendment to the United States Constitution," and for an injunction "prohibiting Defendants from further ordering, directing, sanctioning or knowingly permitting such unconstitutional practices" and requiring defendants "to prescribe and implement measures sufficient to prevent resumption of those practices."
 
 
 2
 The district court granted summary judgment to defendants on the ground that plaintiffs do not have standing to seek equitable relief requiring the Border Patrol to change its practices. We review de novo a grant of summary judgment. See Moreland v. Las Vegas Metro. Police Dept., 159 F.3d 365, 369 (9th Cir. 1998). We agree with the district court that plaintiffs have shown insufficient likelihood of future injury to warrant equitable relief. We therefore do not reach questions involving the propriety of class certification.
 
 
 3
 * Plaintiff Antonio V. Lopez is a United States citizen who lives in Tucson, Arizona. Mr. Lopez describes himself as having what he calls a typically Hispanic appearance--black hair, dark skin and dark eyes. He drives approximately 400 to 500 miles a week and travels two or three days a week on interstate highway I-19 between Tucson and the border town of Nogales. Despite the fact that Mr. Lopez sees Border Patrol agents every time he drives on I-19, he has been stopped only once in a ten-year period.
 
 
 4
 In January, 1995, Mr. Lopez was driving from Nogales to Tucson at approximately 5:30 in the evening. He had his cruise control set at 65 miles per hour when a Border Patrol agent passed him, pulled into his lane in front of him, and slowed to 50 miles per hour. Mr. Lopez moved into the left lane and passed the Border Patrol agent and another vehicle. The agent passed the other vehicle, pulled in behind Mr. Lopez, turned on his headlights, and closely followed Mr. Lopez for five minutes before stopping him. The Border Patrol agent spoke to Mr. Lopez in Spanish, asking where he had come from and where he was going. After Mr. Lopez answered, the agent asked whether he could look in the trunk, and Mr. Lopez consented to the search. When the agent found nothing, Mr. Lopez was allowed to continue on his way.
 
 
 5
 Plaintiff Panchita Hodgers-Durgin is a United States citizen who has lived in Rio Rico, Arizona, since 1985. Ms. Hodgers-Durgin was born in Mexico, but is of English ancestry and has ash blond hair, light skin, and light brown eyes. Ms. HodgersDurgin testified that she drives on I-19 from Rio Rico to Nogales, a distance of approximately 15 miles, at least four or five times a week. According to Ms. Hodgers-Durgin, whenever she travels on I-19 she sees Border Patrol agents "all over the place." Ms. Hodgers-Durgin has been stopped by Border Patrol agents only once in approximately ten years.
 
 
 6
 At 1:00 a.m. on October 8, 1994, Ms. Hodgers-Durgin was returning on I-19 from Nogales to Rio Rico when her car began to malfunction, slowing down of its own accord from 55 to 40 miles an hour. She pulled off at the next exit and when she stopped at the stop sign marking the end of the exit ramp her car stalled. While her car was stalled, a Border Patrol agent who had followed her when she left the highway pulled up behind her. Ms. Hodgers-Durgin managed to restart her car and drive slowly across the highway overpass. She was then stopped by the Border Patrol agent. The agent approached Ms. Hodgers-Durgin's car and asked whether she was a United States citizen. Ms. Hodgers-Durgin replied that she was a citizen and asked why she hadbeen stopped. The agent answered that she had slowed down as she approached his car and had not looked over as she passed. The agent asked what she had in the car and requested that she open the hatchback. Ms. Hodgers-Durgin complied. When the agent found nothing, he returned to his patrol car and drove away.
 
 
 7
 Mr. Lopez and Ms. Hodgers-Durgin seek equitable relief on behalf of a class defined as
 
 
 8
 all persons who have been, are, or will be traveling at night by motor vehicle on the highways of the State of Arizona, within the counties of Cochise, Graham, Greenlea, Maricopa, Pima, Pinal, Santa Cruz and Yuma; and all persons who are of Latin, Hispanic or Mexican appearance who have been, are, or will be traveling by motor vehicle on the highways of the State of Arizona, within the counties of Cochise, Graham, Greenlea, Maricopa, Pima, Pinal, Santa Cruz and Yuma.
 
 
 9
 Mr. Lopez seeks to represent a sub-class of drivers of Hispanic, Latin or Mexican appearance. Ms. Hodgers-Durgin seeks to represent a sub-class of night-time drivers.
 
 II
 
 10
 Though the facts here are substantially different, the most analogous case is City of Los Angeles v. Lyons , 461 U.S. 95 (1983), in which plaintiff Lyons, an African-American man, was stopped at 2:00 a.m. by Los Angeles police officers based on a burned out taillight. According to Lyons' complaint, the officers seized him without provocation and applied a "chokehold." As a result of the chokehold, Lyons lost consciousness, defecated and urinated, and suffered permanent damage to his larynx. Lyons sought an injunction barring the Los Angeles Police Department from using chokeholds except in certain restricted circumstances. The Supreme Court held that Lyons "presumably" had standing to seek damages against the officers and the City of Los Angeles, id. at 105, but that in the absence of a realistic threat of future injury Lyons could not "demonstrate a case or controversy with the City that would justify the equitable relief sought."[1] Noting that Article III "case-or-controversy considerations `obviously shade into those determining whether the complaint states a sound basis for equitable relief,' " id. at 103 (quoting O'Shea v. Littleton, 414 U.S. 488, 499 (1974), the Court concluded that even if Lyons had Article III standing to seek an injunction, the speculative nature of his claim of future injury precluded him from establishing a key prerequisite for equitable relief, "a `likelihood of substantial and immediate irreparable injury.' " Id. at 111 (quoting O'Shea, 414 U.S. at 502). The Court explained that "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administrationof the States' criminal laws in the absence of irreparable injury which is both great and immediate." Id. at 112.
 
 A. "Case or Controversy" under Article III
 
 11
 We do not believe that Lyons compels a finding that plaintiffs fail to satisfy the "case or controversy " requirement of Article III. This case is notably different from Lyons in that plaintiffs did nothing illegal to prompt the stops by the Border Patrol. One could argue that the stop in Lyons was essentially a chance "encounter" between Lyons and the police,[2] but we believe that the Supreme Court does not see the case that way. In Lyons itself, the Court suggested that the stop was prompted by Lyons' misconduct, holding that Lyons had failed to "demonstrate a case or controversy" because he had not established "a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense[.]" Id. at 105 (emphasis added).
 
 
 12
 More recently, in Spencer v. Kemna, 523 U.S. 1, 15 (1998), the Court has characterized the denial of Article III standing in Lyons as having been based on the plaintiff's ability to avoid engaging in illegal conduct. Petitioner in Spencer argued that a challenge to a parole revocation was not moot because the revocation might be used to enhance a future criminal sentence. The Court rejected petitioner's argument in Spencer, as it had rejected a similar argument by respondents in Lane v. Williams, 455 U.S. 624 (1982):
 
 
 13
 [The argument in Lane was rejected] because it was contingent upon respondents' violating the law, get ting caught, and being convicted. "Respondents themselves are able--and indeed required by law- to prevent such a possibility from occurring." Lane, supra, at 633, n. 13. We of course have rejected analogous claims to Article III standing in other con texts.
 
 
 14
 "[W]e are . . . unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws. We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction [as well as exposure to the challenged course of conduct said to be followed by petitioners]." O'Shea v. Littleton, 414 U.S. 488, 497 (1974).
 
 
 15
 See also Los Angeles v. Lyons, 461 U.S. 95, 102-103 (1983).
 
 
 16
 523 U.S. at 15 (bracketed language added to complete quotation from O'Shea, 414 U.S. at 497).
 
 
 17
 Given this interpretation of Lyons by the Supreme Court, it is by no means certain that plaintiffs in this case have failed to assert a cognizable injury under Article III. Unlike in Lyons, in this case it is uncontested that both plaintiffs engaged in entirely innocent conduct, and there is no tenable argument that plaintiffs should avoid driving near the Mexican border in order to avoid another stop by the Border Police. Further, unlike in Lyons, in this case there is no string of contingenciesnecessary to produce an injury. In Lyons, further injury would have required another stop by the police, followed by post-stop behavior culminating in a chokehold. In this case, another stop of the sort alleged by plaintiffs would itself constitute further injury.
 
 B. Equitable Relief
 
 18
 Nonetheless, even if we assume that plaintiffs have asserted sufficient likelihood of future injury to satisfy the "case or controversy" requirement of Article III standing to seek equitable relief, we find that plaintiffs are not entitled to equitable relief because of the second, alternative ground advanced in Lyons: "The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again--a `likelihood of substantial and immediate irreparable injury.' " Id. at 111 (quoting O'Shea, 414 U.S. at 502)[3].
 
 
 19
 The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way. See O'Shea, 414 U.S. 488; Rizzo v. Goode, 423 U.S. 362 (1976); Lyons, 461 U.S. 95; Lewis v. Casey, 518 U.S. 343 (1996). In O'Shea, the Court focused on considerations of federalism, explaining that "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate." Lyons, 461 U.S. at 112; see also O'Shea, 414 U.S. at 499. Of particular concern in that case was maintaining the delicate balance between "federal equitable power and State administration of its own law," O'Shea, 414 U.S. at 500 (quoting Stefanelli v. Minard, 342 U.S. 117, 120 (1951), and determining whether the relief sought "would disrupt the normal course of proceedings in the state courts . . .[and] would require for its enforcement the continuous supervision by the federal court over the conduct of [state officers ] in the course of future criminal trial proceedings[.]" Id. at 501. As the Court explained in O'Shea, "[a] federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable." Id. at 500.
 
 
 20
 In Rizzo, the Supreme Court again focused on federalism in overturning an injunction that would have revised the internal procedures of the Philadelphia police department to minimize incidents of unconstitutional police misconduct. 423 U.S. at 380-81. Quoting O'Shea, the Court explained that
 
 
 21
 even where the prayer for injunctive relief does not seek to enjoin the state criminal proceedings them selves, we have held that the principles of equity nonetheless militate heavily against the grant of an injunction except in the most extraordinary circumstances. In O'Sheav. Littleton, supra , at 502, we held that "a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which this Court has recognized[.]"
 
 
 22
 Rizzo, 423 U.S. at 379-80. Thus, "[w]hen a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with `the well established rule that the Government has traditionally been granted the widest latitude in the "dispatch of its own internal affairs." ' " Id. at 378-79 (quoting Sampson v. Murray, 415 U.S. 61, 83 (1974) (quoting Cafeteria and Restaurant Workers Union Local 473 v. McElroy, 367 U.S. 886, 896 (1961))).
 
 
 23
 In Lyons, O'Shea and Rizzo, the Supreme Court required the plaintiffs to show a likelihood of substantial and immediate irreparable injury in order to give appropriate consideration to the values of federalism. It is not clear from the Supreme Court's opinions that separation of powers concerns counsel against injunctive relief as strongly as do federalism concerns, but it is at least clear that they are relevant and significant. In Lewis v. Casey, 518 U.S. 343 (1996), the Supreme Court discussed principles of federalism and separation of powers in essentially one breath, addressing the proper role of the federal courts in relation to the political branches of both state and federal governments even though, on its facts, Lewis involved an injunction against a state rather than the federal government. Inmates in Arizona prisons brought a class action alleging that the Arizona Department of Corrections was depriving them of access to the courts by, among other things, employing unqualified law librarians, failing to assist illiterate and non-English speaking inmates with their claims, and failing to provide inmates segregated for disciplinary purposes with adequate time in the law library. See id. at 346-47. After a bench trial, the district court granted sweeping systemwide injunctive relief which we affirmed. In reversing, the Supreme Court spoke of injunctions against both the state and federal governments:
 
 
 24
 It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. In the context of the present case: It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presenta tion of claims will not occur . . . . [T]he distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or immi nent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.
 
 
 25
 Id. at 349-50. Noting that only two of the named plaintiffs' individual claims supported plaintiffs' argument that illiterate inmates were denied access to the courts, the Court concluded that "[t]hese two instances were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief." Id. at 359.
 
 
 26
 In LaDuke v. Nelson, 762 F.2d 1318 (9th Cir. 1985), we affirmed an injunction barring the federal Immigration and Naturalization Service from conducting warrantless searches of migrant housing. We distinguished Lyons, Rizzo and O'Shea, noting that all three cases involved "prudential limitations circumscribing federal court intervention in state law enforcementmatters." Id. at 1324. We recognized in LaDuke that "the co-equal branches of the federal government are entitled to `the widest latitude in the dispatch of [their] own internal affairs,' " id. at 1325 (quoting Rizzo, 423 U.S. at 378379), but nonetheless found the likelihood of injury sufficient to warrant injunctive relief. See id. at 1330. We need not consider here the degree to which federalism concerns may compel greater caution than separation of powers concerns in considering a request for injunctive relief. It is sufficient for present purposes to note, following Lewis and LaDuke, that plaintiffs in this suit must satisfy the traditional requirements of equity before they may seek injunctive relief against the Border Patrol.
 
 
 27
 We hold that Mr. Lopez and Ms. Hodgers-Durgin have not demonstrated a sufficient likelihood of injury to warrant equitable relief. Mr. Lopez drives between 400 and 500 miles a week and sees Border Patrol agents nearly every day. Ms. Hodgers-Durgin drives between Rio Rico and Nogales at least four or five times a week and sees Border Patrol agents "all over the place" whenever she travels. Yet Mr. Lopez and Ms. Hodgers-Durgin were each stopped only once in 10 years. Based on plaintiffs' own factual record, we believe that it is not sufficiently likely that Mr. Lopez or Ms. Hodgers-Durgin will again be stopped by the Border Patrol. In the absence of a likelihood of injury to the named plaintiffs, there is no basis for granting injunctive relief that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch.
 
 
 28
 The named plaintiffs' failure to establish a likelihood of future injury similarly renders their claim for declaratory relief unripe. Ripeness doctrine protects against premature adjudication of suits in which declaratory relief is sought. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1966), overruled on other grounds by Califano v. Sanders , 430 U.S. 99 (1977). In suits seeking both declaratory and injunctive relief against a defendant's continuing practices, the ripeness requirement serves the same function in limiting declaratory relief as the imminent-harm requirement serves in limiting injunctive relief. We need not consider whether plaintiffs' declaratory relief claim is ripe in the Article III sense because the claim fails the prudential ripeness inquiry, which "requir[es] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149. As the Supreme Court recently wrote, translating the language of injunctions and imminency into the language of declaratory judgments and ripeness, "A claim is not ripe for adjudication if it rests upon `contingent future events that may not occur as anticipated, or indeed may not occur at all.' " Texas v. United States, 523 U.S. 296, 118 S. Ct. 1257, 1259 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985) (internal quotation omitted)). Whether the named plaintiffs are likely to be stopped again by the Border Patrol is simply too speculative to warrant an equitable judicial remedy, including declaratory relief, that would require, or provide a basis for requiring, that the Border Patrol change its practices.
 
 C. Unnamed Class Members
 
 29
 Citing our earlier decision in Nicacio v. INS, 797 F.2d 700, 702 (9th Cir. 1986), plaintiffs contend that they, and the class they seek to represent, should be able to seek an injunction based on the likelihood of future injury to unnamed class members. It is true that several unnamed members of the class have suffered more frequent, and more recent, injuries than have Mr. Lopez and Ms. Hodgers-Durgin.Mr. Jesus de la Varga was stopped by Border Patrol agents three times in 1994 and 1995. Mr. Javier Barajas was stopped at least four times from 1992 to 1995. Mr. Luis Villa was stopped on more occasions than he could recall. Were those individuals named plaintiffs, they might well be able to demonstrate the likelihood of injury required to pursue equitable relief of the sort sought by Ms. Hodgers-Durgin. See Wooley v. Maynard, 430 U.S. 705 (1977) (holding equitable relief available where plaintiff had been prosecuted three times for obscuring "Live Free or Die" motto on his license plate); Kolender v. Lawson, 461 U.S. 352 (1983) (holding plaintiff who had been stopped fifteen times had standing to challenge an anti-loitering statute as unconstitutionally vague). If such plaintiffs could show sufficient injury to warrant equitable relief, that relief would, of course, have to be tailored to conform to the circumstances of these plaintiffs and the class they seek to represent.
 
 
 30
 As we read Lewis, however, system-wide injunctive relief is not available based on alleged injuries to unnamed members of a proposed class.
 
 
 31
 The remedy must of course be limited to the inadequacy that produced the injury in fact that the plain tiff has established. This is no less true with respect to class actions than with respect to other suits."That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class `must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' "
 
 
 32
 518 U.S. at 357 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976) (quoting Warth v. Seldin, 422 U.S. 490, 502 (1975))) (internal citations omitted). To the extent that we held otherwise in Nicacio, we believe that decision has been disapproved in Lewis. Here, no class members other than Mr. Lopez and Ms. Hodgers-Durgin have chosen to join the action as named plaintiffs. Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief. Any injury unnamed members of this proposed class may have suffered is simply irrelevant to the question whether the named plaintiffs are entitled to the injunctive relief they seek.
 
 III
 
 33
 Because we find that the named plaintiffs have not alleged sufficient injury to entitle them to equitable relief, we need not reach the question whether the class that plaintiffs seek to represent was properly certified.
 
 IV
 
 34
 The district court's decision granting summary judgment for defendants is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 We have previously held that where claims for damages and equitable relief arise from the same "operative facts and legal theory" a plaintiff with standing to seek damages also has standing to request injunctive and declaratory relief. See Nava v. City of Dublin , 121 F.3d 453, 456 (9th Cir. 1997) (citing Gonzales v. City of Peoria, 722 F.2d 468 (9th Cir. 1983); Giles v. Ackerman, 746 F.2d 614, 619 (9th Cir. 1984) (per curiam); Smith v. City of Fontana, 818 F.2d 1411, 1423 (9th Cir. 1987)). We applied that rule in Nava to hold that a plaintiff had standing to seek injunctive relief barring the California Highway Patrol's use of chokeholds even though the suit was "remarkably similar" to the Supreme Court's decision in Lyons. See id. at 455-56 (quoting Lyons, 461 U.S. at 102 (internal quotation omitted)). We believe that Nava's holding that standing to seek damages serves as a basis for standing to seek equitable relief is inconsistent with Lyons, and we therefore overrule Nava and our prior decisions on which Nava relied. See id. at 460 (B. Fletcher, J., specially concurring)("I cannot reconcile [the Nava line of cases ] with Lyons. We should take this case en banc to decide whether the exception we have carved out . . . should remain the law of our circuit.").
 
 
 [2]
 See Lyons, 461 U.S. at 105-08 ("In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner. . . . We note that five months elapsed between October 6, 1976, and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police.") (emphasis added).
 
 
 [3]
 By assuming the existence of Article III standing and resolving the case based on plaintiffs' failure to establish a prerequisite for equitable relief, we do not violate "the rule that a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits." Ruhrgas Ag v. Marathon Oil Co., 526 U.S. 574, 119 S. Ct. 1563, 1566-67 (1999) (citing Steel Co. v. Citizens for Better Env't, 523 U.S. 83 (1998)). We affirm summary judgment for defendants not based on the underlying merits of plaintiffs' claims but based on the scope of our equitable power to grant injunctive relief. See id. at 1570 ("A court that dismisses on . . . non-merits grounds . . . , before finding subject-matter jurisdiction, makes no assumption of law-declaring power that violates the separation of powers principles underlying . . . Steel Company .").
 
 
 
 35
 REINHARDT, Circuit Judge, specially concurring:
 
 
 36
 This is not a case about federalism. Nor is it a case about separation of powers. Instead, it is a straightforward case about the traditional requirement that plaintiffs show a threatened injury in order to secure equitable relief against unconstitutional conduct. Judge W. Fletcher's opinion for the court holds that, under the facts of this case, the named plaintiffs did not make a sufficient showing of threatened injury to warrant relief under the traditional doctrine of equity. I agree with that conclusion, as well as with the discussion concerning that point, and I therefore concur in the court's opinion. I write separately, however, in order to disassociate myself from some of the opinion's dicta and to attempt to make plain what we are deciding and what we are not. Iparticularly want to emphasize that, under the court's opinion, if the plaintiffs had been able to make a sufficient showing -if, for example, they had been stopped repeatedly by the Border Patrol for the reasons alleged -there would be no barrier to a federal court's issuing an appropriate injunction against such unlawful governmental conduct in a class action proceeding. Indeed, it is the role of the judicial branch to protect people against constitutional violations of their rights by the executive and legislative branches. The proper performance of that function in no way violates the separation of powers doctrine. To the contrary, it implements it.
 
 
 37
 Any analysis of the case before us should begin with the fact that it involves the actions of the United States Border Patrol and not the operation of a state institution. Because this case concerns a federal institution, there is, in my opinion, no cause for the extensive discussion of federalism that precedes the opinion's holding and the relevant part of its analysis. Moreover, I do not agree with the opinion's suggestion that the various cases it surveys raise separation of powers concerns that are pertinent here. First, all the cases that the opinion canvasses -save one -concern state, not federal, institutions. See Lewis v. Casey, 518 U.S. 343 (1996) (Arizona state prisons); City of Los Angeles v. Lyons, 461 U.S. 95 (1983) (Los Angeles police department); Rizzo v. Goode, 423 U.S. 362 (1976) (Philadelphia police department); O'Shea v. Littleton, 414 U.S. 488 (1974) (Alexander County, Illinois criminal justice system). Those cases, therefore, do not involve the question whether and to what extent separation of powers concerns arise when a challenge is brought regarding conduct engaged in by officials of a federal institution. Second, the one case discussed in the opinion in which the conduct of federal officials was at issue, LaDuke v. Nelson, 762 F.2d 1318 (9th Cir. 1985), is a case in which we rejected the argument that separation of powers concerns were implicated. See LaDuke, 762 F.2d at 1325 ("While the co-equal branches of the federal government are entitled to `the widest lattitude in the dispatch of [their] own internal affairs,' the executive branch has no discretion with which to violate constitutional rights." (citation omitted))[1].
 
 
 38
 It is true, as the court's opinion notes, that one of the cited cases involving state institutions, Lewis v. Casey, discusses separation of powers concerns in addition to principles of federalism. Judge W. Fletcher relies heavily on a quote from Lewis that states that it is not the role of courts to shape political institutions. (See Op. at 14763). Even assuming that the quoted portion of Lewis should be applied to cases involving federal institutions, the statements are wholly inapplicable to the present case, for three reasons. First, Lewis involved an injunction against a prison system. As the Lewis majority and both its concurrences emphasized, the Supreme Court has granted special deference to the administrative decisions of prison authorities and has limited the role of the judiciary in reviewing the determinations of those officials. See Lewis, 518 U.S. at 349, 361-62 (majority opinion); id. at 364-65, 386-87, 391 (Thomas, J., concurring); id. at 393, 402 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). Reading Lewis's statements about deference to administrative decisions in that context, the case setsforth no new or startling principles, and is of no relevance here.
 
 
 39
 Second, the Lewis majority explained that its analysis would have been different had the asserted entitlement (a right to a law library) been constitutionally required. See Lewis, 518 U.S. at 350 ("The foregoing [separation of powers analysis] would not be pertinent here if, as respondents seem to assume, the right at issue -the right to which the actual or threatened harm must pertain -were the right to a law library or to legal assistance. But Bounds establishes no such right."). Because the absence of law libraries did not constitute a cognizable injury within the meaning of the Fourteenth Amendment, the Lewis Court concluded that granting relief for such an injury would improperly infringe upon the political branches. In the present case, however, the entitlement asserted -the right to be free from race-based governmental discrimination in general and from searches and seizures based on race in particular -is constitutionally mandated. It is a right that the courts have the primary obligation to protect. For that reason, the plaintiff's assertion of the rights they seek to enforce does not raise the separation of powers concern described in Lewis[2].
 
 
 40
 Third, and most important, the separation of powers discussion in Lewis is irrelevant in the present case because the plaintiffs here did not seek relief that would preclude the executive branch from managing one of its own institutions. The district court in Lewis granted sweeping injunctive relief that "specified in minute detail" how the prisons were to be run. See Lewis, 518 U.S. at 347-48. Here, in contrast, the plaintiffs did not ask the judiciary to specify "in minute detail" how the Border Patrol would be operated: they sought only a simple negative injunction against unconstitutional racial profiling and an order requiring the Border Patrol itself to take steps to ensure that its officers did not engage in racial profiling.[3] Thus, while the separation of powers concerns that the Lewis court raised stemmed in substantial part from the structural relief afforded by the district court, see Lewis, 518 U.S. at 349-357, such concerns are unrelated to the present case. In the end, therefore, Lewis, like the other state institutions cases, is simply irrelevant to the case before us.
 
 
 41
 I do agree with the pertinent parts of the court's opinion, however. I agree with its holding -that plaintiffs seeking an injunction "must satisfy the traditional requirements of equity." I also agree with its application of its holding -namely, that the named plaintiffs have failed to do so here. (See Op. at 14764) The court is correct in concluding that this is a case in which, at the early stage of summary judgment, the weakness of the evidentiary showing is such that we are compelled to conclude that the named plaintiffs have simply failed to make the necessary demonstration of injury.
 
 
 42
 In reality, all we hold in this case is that Ms. Hodgers-Durgin and Mr. Lopez are not the right plaintiffs to have filed this class action. We do not suggest that a class action brought by proper plaintiffs would offend concepts of federalism or separation of powers. The facts on summary judgment revealed that both named plaintiffs had been driving for many years on the roads at issue, and both had seen Border Patrol agents nearly every day during this time. In spite of their frequenttravel and the Border Patrol's substantial presence, each named plaintiff had been stopped just once. Moreover, Ms. Hodgers-Durgin's sole stop occurred immediately after her car slowed suddenly on the freeway, stopped for several minutes at an empty intersection, and then continued extremely slowly over a highway overpass. In light of her erratic behavior on the road, it is not surprising that she was stopped by a law enforcement officer. On the basis of the factual record before us, the court's opinion correctly concludes that Mr. Lopez and Ms. Hodgers-Durgin have failed to make a showing that there is any likelihood that either of them will again be stopped by the Border Patrol.
 
 
 43
 I should discuss one more point in order to make clear the limits of our decision. This is not a case in which there are no potential individual plaintiffs who meet the requirements for equitable relief even though it is likely that the would-be class, considered as a whole, does so. In the present case, the plaintiffs' own evidence demonstrates that unnamed plaintiffs were available who could have met the traditional requirements for equitable relief. As the court's opinion points out, several unnamed class members were stopped more frequently and more recently than Mr. Lopez or Ms. Hodgers-Durgin. One of those class members, Mr. Luis Villa, was stopped on more occasions than he could recall. Had Mr. Villa been a named plaintiff, his showing of likely future injury would in all probability have been sufficient to overcome summary judgment. That fact alone shows that this is a case about the selection of improper class representatives -and not a case about "our federalism" or about separation of powers. Moreover, were this a case in which a class, considered as a whole, was threatened with injury, but in which none of the individual plaintiffs could make the traditional showing of "imminent injury," our judgment would likely have been different. On those different facts, the flexible doctrine of equity would have demanded a different approach -an approach that would have ensured that a class of minority group members may pursue a claim of unconstitutional racial profiling. That is not this case, however.
 
 
 44
 I write this concurrence so that our opinion will not inadvertently lead district judges to believe that we have erected new barriers to the prosecution of racial profiling claims by class plaintiffs. I am confident that if (or when, given the unfortunate reality) racial profiling cases arise in the future, this court will continue to acknowledge that the Constitution guarantees relief from such unconstitutional conduct, see, e.g., Nicacio v. INS, 797 F.2d 700 (9th Cir. 1986), that the federal courts have the primary obligation to protect constitutional rights, and that appropriate class representatives may seek relief on behalf of minority group members whose Fourteenth Amendment rights are threatened. Because the opinion's narrow holding, and the relevant part of its discussion, do not retreat from our previous positions in these respects, I concur.
 
 
 
 Notes:
 
 
 [1]
 LaDuke also made plain that as a general matter it makes little sense to analogize a case involving federal officials to cases involving state officials. See LaDuke, 762 F.2d at 1325 ("Obviously, none of the considerations inherent in the judicial concept of `Our Federalism' are implicated in constitutional challenges to executive branch behavior in federal courts . . . . Accordingly, the comity considerations which influenced the Supreme Court's decisions and O'Shea, Rizzo and Lyons are inapplicable in this case." (citation omitted)).
 
 
 [2]
 This is true also of the plaintiffs' claim that the Border Patrol violated the Fourth Amendment by applying a policy of stopping, without probable cause or reasonable suspicion, persons driving at night on the highways of Arizona.
 
 
 [3]
 Even if the plaintiffs had sought to have the district court assume operational control of the Border Patrol, the court would not have been bound by that request. Rather, had a constitutional violation been established, the court would have had a range of constitutional remedies available to it, including the remedies actually sought by the plaintiffs.