Kevon GORDON, Ronald Jones, Raymond Barnes, and Quincy Brown, Plaintiffs,

v.

CITY OF MORENO VALLEY; County of Riverside; Rick Hall, Chief of the Moreno Valley Police Department; Kristy Underwood, Executive Officer of the California Board of Barbering and Cosmetology; Stan Sniff, Riverside County Sheriff; Tony Heisterberg; Dennis Longdyke; Lori Miller; Seth Hartnett; Robert Duckett; Mario Herrera; Eric Brewer; Anthony Johnson; Christopher Gastinger; Richard Hutson; Joe Brown; Xochi Camargo; and Arlene Bauby, Defendants.

Case No. EDCV–09–688–SGL (SSx).

United States District Court, C.D. California, Eastern Division.

Aug. 31, 2009.

Peter Bibring, Peter J. Eliasberg, Mark D. Rosenbaum, ACLU Foundation of Southern California, Rishi Puri, Stacy D. Shartin, Seyfarth Shaw LLP, Los Angeles, CA, for Plaintiffs.

Michael A. Bell, LaFollette Johnson De-Haas Fesler and Ames, Riverside, CA, Michael Anthony Brown, Timothy T. Coates, Greines Martin Stein and Richland LLP, Los Angeles, CA, William A. Buess, Diane Elisabeth De Kervor, Richard F. Wolfe, CAAG–Office of the Attorney General of California, San Diego, CA, Robert L. Hansen, Robert D. Herrick, City of Moreno Valley, Moreno Valley, CA, Christopher D. Lockwood, Arias and Lockwood, John M. Porter, Lewis Brisbois Bisgaard and Smith LLP, San Bernardino, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS BUT WITH LEAVE TO AMEND (DOCKET # 54); ORDER DENYING DEFENDANT'S MOTION TO DISMISS (DOCKET # 21); ORDER HOLDING IN ABEYANCE RULING ON DEFENDANTS' MOTION TO DISMISS PENDING COMPLETION OF JURISDICTIONAL DISCOVERY (DOCKET # 16)

STEPHEN G. LARSON, District Judge.

This case arises from a series of warrantless "raid-style searches" all performed under the auspices of an administrative health and safety inspection of mostly African American-run barbershops in the City of Moreno Valley on April 2, 2008, by local police, in coordination with state and local inspectors.

Presently before the Court are three motions filed by various defendants to dismiss some or all of the claims contained in the complaint.

For the reasons set forth below, the Court **GRANTS** (subject to certain proviso) the individual Code Enforcement defendants' motion to dismiss, but **DENIES** the remainder of the motions to dismiss as either prematurely filed or requiring further factual development before their merits can be resolved.

## I. FACTUAL ALLEGATIONS

### A. *The Barbershops*

Plaintiffs Kevon Gordon and Ronald Jones (both of whom are African American) have operated the Hair Shack, a barbershop located in Moreno Valley, California, since 1987. Although the Hair Shack serves a variety of clients, the majority are African American. The front lobby to the establishment is decorated with posters showing sample haircuts, all of which use

African American models. Moreover, the magazines on display in the lobby for customers to peruse are directed to an African American readership, including Ebony, Hip Hop Soul, King, Smooth Hair, and Source.

Fades Unlimited operated as a barbershop in Moreno Valley from 2003 until 2008. During 2007 and 2008, plaintiffs Raymond Barnes and Quincy Brown (both of whom are also African American) worked at Fades Unlimited as barbers on an independent contractor basis, paying a weekly fee for a station at the barbershop and retaining all proceeds generated from haircut services provided to their clients. Like Hair Shack, most of the clientele at Fades Unlimited were African American. Indeed, the name "Fades Unlimited" itself refers to a type of haircut, a "fade," that is popular among African American men. Inside the lobby to the barbershop there were pictures of sample haircuts, all or substantially all of which used African American models. The lobby also contained, like at the Hair Shack, magazines directed toward an African American readership. Moreover, art on the walls at the barbershop represented African American subjects.

In addition to hair cut services, both of these barbershops served as a community and social center for African American residents in Moreno Valley. For instance, on weekends customers at the Hair Shack often remained to socialize after their haircuts were finished, and long-time customers would stop by to talk without getting a haircut at all. To that end, the Hair Shack allowed customers to play cards and dominoes in a back room on the premises not used for barbering.

## B. *The April 2, 2008, Raid–Style Administrative Inspections*

On April 2, 2008, officers from the Moreno Valley Police Department ("MVPD"), acting in conjunction with state inspectors from the California Department of Consumer Affairs Board of Barbering and Cosmetology (the "Board") and local inspectors from the City of Moreno Valley Code and Neighborhood Services Division ("Code Enforcement"), conducted unannounced administrative health and safety inspections on six barbershops in Moreno Valley. Five of the six barbershops inspected (which included the Hair Shack and Fades Unlimited) were owned and operated by African Americans and served primarily an African American clientele.[1]

During the raid on the Hair Shack, two MVPD police cars pulled up to the front of the shop, while another police patrol car pulled into the alley behind the establishment. Approximately five MVPD officers wearing bulletproof vests and carrying firearms ran into the barbershop, accompanied by three Board inspectors and two inspectors from Code Enforcement. One MVPD officer stood in the front doorway while others entered the barbering area and the back room of the shop where customers played cards and dominoes. The MVPD officer in the alley guarded the back door to the Hair Shack from his patrol car, presumably to prevent customers and/or barbers inside the shop from trying to escape the "administrative inspection" from the rear exit. None of the officers ever claimed that they had a warrant to conduct a search, nor was a warrant ever produced.

For approximately one half hour, "the MVPD, Code Enforcement, *and* Board officers" and inspectors conducted an extensive search of the Hair Shack, "including

---

**1.** No information has been provided as to the nature of the sixth barbershop that was inspected on April 2, 2009, either as to its ownership or the clientele who frequented it.

areas where no barbering was performed," *and* "questioned employees and customers." (First Am. Compl. ¶ 24 (emphasis added)). "During the search, MVPD officers followed Board [inspectors] closely and looked in the drawers and cabinets as [the inspectors] opened them and searched their contents." (*Id*). It is alleged that "the search" conducted on April 2, 2008, "was more extensive and intrusive than" had been used in "any ordinary business inspection" to "determine compliance with barbering or business regulations." (First Am. Compl. ¶¶ 3, 24). Moreover, it is further alleged that all the previous inspections conducted at the establishments in question took place in a "peaceful nature" without "any physical threat" manifested by either the barbers or patrons. (*Id.*)

The raid on Fades Unlimited contained many of the same hallmarks as that at the Hair Shack.[2] MVPD officers, again wearing bulletproof vests and armed with hand guns, accompanied by Code Enforcement and Board inspectors, rushed into the establishment and blocked the entrance so that no one could enter or leave. MVPD officers questioned employees and customers, collected drivers licenses from them, and ran warrant checks on them. Likewise, officers *and* inspectors conducted an extensive search of the shop, with MVPD officers following closely behind and looking in the drawers and cabinets as inspectors opened them and searched their contents. (First Am. Compl. ¶ 25). When plaintiff Brown expressed his objections to the nature of the inspections, an officer handcuffed him, took him to a patrol car in the parking lot, placed him handcuffed in the back of the vehicle, and told him they had found an outstanding warrant. After about ten minutes, officers released Brown and allowed him back inside the barbershop.

This was not the first time that Fades Unlimited had been inspected by the MVPD. On two previous occasions, once in late 2007 and then again in early 2008, Fades Unlimited "had been subjected" to "warrantless 'inspections' ... once by MVPD officers [by themselves] and once by MVPD officers along with one Code Enforcement [inspector]." (*Id.* ¶ 5). During the late 2007 inspection, "MVPD officers demanded identification from barbers and customers, ran warrant [checks], and searched through drawers and containers." (*Id.*). Moreover, MVPD officers "took one of the barbers to his residence, searched it with his consent, and returned him to the shop." (*Id.* ¶ 27). During the inspection conducted in early 2008, a Code Enforcement inspector accompanied a MVPD officers to Fades Unlimited and "conducted a cursory visual inspection of the shop." (*Id.* ¶ 28). Once again MVPD officers collected identification from all the barbers inside the store and ran warrant checks against them during the "inspection." (*Id.*)

It is alleged that these "raid-style" health and safety inspections on April 2, 2008, "produced no evidence of wrongdoing other than routine issues concerning maintenance and storage of barbering supplies and equipment." (*Id.* ¶ 3). Moreover, it is alleged that this joint operation on April 2, 2008, "was initiated and undertaken at the request of MVPD officers." (*Id.*) It is further alleged that, given the need for multi-agency coordination and the unusual nature of the raids themselves, "supervisors at Code Enforcement, MVPD (or the Sheriff's Department) and/or the Board approved in advance the manner in which the raids would be conducted, which businesses would be selected for raid, or the manner in which businesses would be selected for raids." (*Id.* ¶ 35).

2. It is further alleged that "the inspections conducted at the other [three] African–American businesses on April 2, 2008, were ... similarly invasive and intrusive." (*Id.* ¶ 29).

Business declined precipitously at both the Hair Shack and Fades Unlimited following these raids. (*Id.* ¶¶ 3, 31).

## C. *The Aftermath*

The raids that took place on April 2, 2008, provoked a public outcry among members of the local community, leading to several media stories and a community meeting with the Mayor of Moreno Valley. In comments to the media and to the public, "the Mayor, City Council members, and [the police chief] defended the raids as legitimate law enforcement operations." (*Id.* ¶ 30). The Riverside County Sheriff's Department characterized the raids as a "City issue."[3] (*Id.*) One Code Enforcement inspector told members of the press that his department would continue to conduct such sweeps in the future, saying, "This is not a one-time event." (*Id.*)

Plaintiffs later filed the instant civil rights lawsuit alleging that their federal and state constitutional rights had been violated, namely, their right against racial discrimination by the State (and its agents) and their right to be free from unreasonable warrantless searches by the State (and its agents). Plaintiffs' lawsuit seeks relief in the form of compensatory damages against the City, the County, and the various individual MVPD, Code Enforcement and Board officers or inspectors involved in the raids themselves. Moreover, plaintiffs seek injunctive relief against the Riverside County Sheriff, the Moreno Val-

ley Police Chief, and the head of the Board barring further "racial profiling and the conduct of administrative searches" (and/or a declaration that, to the extent "state statutes and regulations authorized [such] conduct," those statutes and regulations are "unconstitutional" under the Fourth Amendment[). As explained in their opposition papers, the purpose for the requested "injunctive relief [was] to insure that future business inspections would not take on the appearance of criminal raids." (Opp. at 1).

Various defendants have since filed motions to dismiss which, when considered in the aggregate, seek dismissal of the entirety of plaintiffs' complaint, arguing that the complaint's request for prospective injunctive relief is barred as plaintiffs cannot demonstrate they have standing to seek such relief, that the allegations pled do not demonstrate that the "raid-style" administrative inspections were motivated by plaintiffs' race, and that the inspections themselves (including the manner in which they were conducted) are constitutionally permissible. The Court addresses each argument in turn.

## II. ANALYSIS

### A. *Standing for Requested Injunctive Relief*

Article III to the United States Constitution limits the power of federal courts to actual "cases" and "controversies" among the litigants before it. U.S. Const. Art. III, sect. 2.[4] To demonstrate

---

**3.** The Riverside County Sheriff's Department "operates the MVPD pursuant to a contract to provide police services to the City of Moreno Valley," and accordingly "remains responsible" in part for the MVPD's "policies and procedures" as well as "the discipline of officers assigned to the MVPD, who remain employees ... of the County." (*Id.* ¶ 14).

**4.** Although defendants have raised the standing question under the auspices of Rule

12(b)(6), the more appropriate lens by which to view the pleadings and the arguments raised thereunder is by way of Rule 12(b)(1). See 15 James Wm. Moore, Moore's Federal Practice § 101.30[1] at 101–19 (3rd ed. 2009) ("the issue of standing should be raised by a motion to dismiss for lack of jurisdiction over the subject matter" per "Fed.R.Civ.P. 12(b)(1)"). Moreover, although it is not clear from the pleadings whether the requested injunctive relief is based solely or in tandem

such an actual controversy is presented, a plaintiff must show that he or she has a "personal stake in the outcome" of the litigation. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Insofar as a request for injunctive relief is concerned, a plaintiff meets this test by demonstrating that the injury or the threat of future injury which he or she seeks to enjoin from occurring at the hands of defendants "as a result of the challenged official conduct" is "both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 102, 103 S.Ct. 1660. These "case-or-controversy considerations 'obviously shade into those determining whether the complaint states a sound basis for equitable relief.'" *Id.* at 103, 103 S.Ct. 1660 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Notably, an equitable remedy, such as injunctive relief, "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiffs will be wronged again." *Id.* at 111, 103 S.Ct. 1660.

Here, the parties focus on whether a showing of future injury has been met given that the present request for injunctive relief is predicated upon the assertion that plaintiffs will face more of these raid-style inspections going forward. As explained by defendants, the "last acts alleged in the complaint were on April 2, 2008, more than a year ago. [Without an] allegation of any ongoing problem" there is no "basis for believing that the plaintiffs are at all likely to suffer any future injuries of any kind." (Mot. Dismiss at 9).

For plaintiffs to have standing to support the issuance of injunctive relief in the context of an assertion of the prospect of future injury, there must be some "realistic threat" or "danger" that the injury will actually occur, *id.* at 106 n. 7, 103 S.Ct. 1660; *Babbitt v. United Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); the "mere possibility of future injury" is not enough. *Gospel Missions of America v. City of Los Angeles,* 328 F.3d 548, 555 (9th Cir.2003). Thus, "claims that are deemed too speculative to support the injury component of standing often depend on a chain of speculative contingencies that must occur for the alleged injury to manifest itself." Moore's Federal Practice § 101.40[4][b][ii] at 101–42 (citing *Whitmore v. Arkansas,* 495 U.S. 149, 155, 157, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) and *Lee v. Oregon,* 107 F.3d 1382, 1388 (9th Cir.1997)). This "chain of speculative contingencies" principle has manifested itself in a line of cases where the injury sought to be enjoined is "dependent on the plaintiff either committing or being charged with a crime in the future or otherwise coming into contact with law enforcement." *Id.* at 101–44; *see also Hodgers–Durgin v. de la Vina,* 199 F.3d 1037, 1041–42 (9th Cir.1999) (en banc) ("unlike in *Lyons,* in this case there is no string of contingencies necessary to produce an injury").

For example, in *Lyons,* 461 U.S. at 101–102, 105, 107, 103 S.Ct. 1660, an allegation that a plaintiff was illegally choked while being arrested certainly gave "plaintiff standing to sue for damages, but it did not" by itself "give him standing to seek an injunction barring the police from using the choke hold in the future," even if "po-

---

with state and federal claims, given that what is needed to establish standing to seek injunctive relief is the same under both California and federal law, *compare Easyriders Freedom F.I.G.H.T v. Hannigan,* 92 F.3d 1486, 1495 (9th Cir.1996) *with Intel Corp. v. Hamidi,* 30 Cal.4th 1342, 1352, 1 Cal.Rptr.3d 32, 71 P.3d 296 (2003), the Court will address the question under the rubric of federal case law on standing.

938

lice officers in that area routinely applied choke holds regardless of whether the officers were threatened by the use of deadly force." As explained by the Supreme Court, for Lyons to have faced this prospect of injury again the future, he would not only have to show "that he would have another encounter with the police but also ... make the incredible assertion [that] either ... all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter [whatever its purpose] or that the City order[s] or authorize[s] police officers to act in such a manner." *Id.* at 105–106, 103 S.Ct. 1660; *see also Hodgers–Durgin,* 199 F.3d at 1042 ("In *Lyons,* further injury would have required another stop by the police, followed by post-stop behavior culminating in a choke-hold").

It is in this vein that courts have held that the "likelihood of a future injury cannot be based *solely* on the defendant's conduct in the past." MOORE'S FEDERAL PRACTICE § 101.40[4][d] at 101–47 (emphasis added). But as with much in the law, past encounters with the challenged conduct are not completely irrelevant to the standing inquiry. As one well-respected treatise has summarized:

> The likelihood of injury-causing conduct being repeated, causing future injury to the plaintiff [so as to warrant prospective injunctive relief], depends in part on whether the conduct was random and who committed it. An allegation of future injury based on a predicted repetition of random or unauthorized acts of a third party that caused injury in the past will probably be deemed too speculative to satisfy the injury-in fact requirement. In contrast, when the acts that caused the past injury were authorized by, or were part of a policy of, the defendant, it is significantly more likely that the actions, and thus the injury, will recur.

MOORE'S FEDERAL PRACTICE at 101–48 to 101–49 (3rd ed. 2009); *see also Lyons,* 461 U.S. at 105–106, 103 S.Ct. 1660.

Thus, in *Hodgers,* the Ninth Circuit "assumed" that a case or controversy existed on account of the allegation that there existed a policy to pull over individuals driving along the border without cause, 199 F.3d at 1042 ("in this case, another stop of the sort alleged by plaintiffs would itself constitute further injury"), but ultimately concluded that the particular plaintiffs could not demonstrate "a sufficient likelihood of" such injury occurring because the record demonstrated that the plaintiffs, despite constantly traversing the area where this program had been put in place for years by defendants, had only been subjected to such a stop once. *Id.* at 1044 (despite driving in the affected geographical area "four or five times a week" and "see[ing] Border Patrol agents nearly every day," plaintiffs "were each stopped only once in 10 years").

■ Here, the only evidence plaintiffs have been able to produce or allege to demonstrate that they face the real prospect of injury in the future on account of these raid-style inspections are that (1) they were subjected to these raids on April 2, 2008; (2) that such similar-style inspections had been conducted before on Fades Unlimited in late 2007 and early 2008; and (3) the comment to the press from one Code Enforcement inspector that such inspections were not a "one-time event." As explained in its opposition papers: "[T]hese raids were carefully and deliberately planned, conducted in a consistent manner, and defended afterwards by officials who promised they would recur.... [T]hese plaintiffs need no string of contingencies to face such raids again—indeed the raid's harm lies in the fact they targeted barbers who were doing nothing more than lawfully operating respected busi-

nesses.... Plaintiffs need not violate any law or engage in any altercation with defendants to be subjected to the defendants' *unlawful* conduct. All that is needed [to face this harm again] is another *unlawful* search." (Opp. at 2, 8 (emphasis added);). But that is the very problem with the allegations in the complaint as currently stated: Without some indication that these raid-style inspections (not just inspections in general) are part of some formal or sub-rosa policy of one or more of the defendants, there is simply nothing here to rebut the conclusion that, should one or more of these plaintiffs and/or barbershops encounter such a raid in the future, it will be nothing more than one of those predicated on the repetition of an otherwise random act. *See Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir.2001) (noting that standing may be shown by proof that, "at the time of the injury, a written policy" existed and "the injury stems from that policy" or "the harm is part of a 'pattern of officially sanctioned ... behavior'"). Simply put, there must be something indicating that the conduct sought to be enjoined (namely, the raid-style inspections) will reoccur and that it also has some real, ongoing link purposefully directed to plaintiffs.

Although plaintiffs are certainly correct that they would have standing if they were members of a group or class that is "the specific focus of a law or policy," (Opp. at 7) (citing *Thomas v. County of Los Angeles*, 978 F.2d 504, 508 (9th Cir.1992)), but nowhere in their complaint have they alleged that such a law or policy (formal or informal) is in place authorizing these raid-style inspections and that such inspections are being directed to African–American barbershops. Unlike in *Lyons*, plaintiffs in this case would not "need to violate any law or engage in any altercation with defendants to be subjected to" a raid-style inspection, (Opp. at 8), but there is simply no indication that such a raid would occur on a regular or periodic basis, as opposed to its occurrence being the product of random chance. Plaintiffs attempt to fill this vacuum by noting that barbershops are "subject to *lawful* periodic inspections" by Board and Code Enforcement inspectors, (Opp. at 8 (emphasis added)); however, it is not to inspections *per se* that plaintiffs' complaint is directed, but instead it is the particular form *some* inspections have taken, namely, the raid-style inspection in this context which they claim is unlawful. Thus this case is unlike *Hodgers–Durgin* where any stop made by Border Patrol agents was alleged to be unlawful; here, plaintiffs admit at the outset that defendants can lawfully subject their premises to inspections. The likelihood of later, lawful inspections occurring cannot be bled into or otherwise used to bolster the likelihood that the former, allegedly unlawful raid-style inspections will occur. Without any indication that this *particular* form of inspections will occur on periodic basis, such as again would be the case if they were instituted as part of some policy or practice by the MVPD, Code Enforcement, and/or the Board, there is simply nothing here to show that the likelihood of any injury plaintiffs may suffer in the future would be anything but a conjectured possibility.

■ Nonetheless there is some indication in the complaint that these raid-style inspections *may* be part of some recent formal or informal policy: The inspections conducted on April 2, 2008, were not the first time defendants have engaged in such a practice. Fades Unlimited was subjected to similar types of inspections in late 2007 and once again in early 2008. Moreover, the comment from a Code Enforcement official, following the uproar caused by the April 2, 2008, "inspections," that these raid-style "sweeps" were not a "one-time event" could *suggest* that there may be a larger, authorized program going on

here. However, the suggestion that such a policy could be in place is no substitute for an allegation actually demonstrating that there is one in place or, at least, an allegation from which it can be inferred that such policy does in fact exist.

This brings the Court to the last and, ultimately, most salient point—it is entirely too early in this case to conclude whether or not a policy or practice is in place that would put the plaintiffs in real danger of being continually subjected to these raid-style inspections as part of the otherwise routine inspections of their business establishments authorized by statute. The decision in many of the standing cases cited to by the parties occurred after an evidentiary hearing (or upon the submission of declarations and evidence in conjunction with a preliminary injunction motion) or on a motion for summary judgment after discovery had been completed in the case. *See Lyons,* 461 U.S. at 99–100, 103 S.Ct. 1660 (decision made after evidentiary hearing on preliminary injunction motion); *Hodgers–Durgin,* 199 F.3d at 1039 (decision tendered on a motion for summary judgment); *Thomas,* 978 F.2d at 506–07 (decision rendered after submission of "volumes of declarations and affidavits" on preliminary injunction motion). It is on this basis that plaintiffs have requested that the Court afford them the opportunity to conduct further jurisdictional discovery on this issue before the Court conclusively rules on the matter (should it determine that the present allegations in the complaint are insufficient to establish standing, which the Court at this point finds is the case). (Opp. at 2 (noting that "detailed factual allegations to support [an] allegation of [policy,] custom or practice may not be possible prior to discovery, when facts supporting standing for injunctive relief are in the hands of defendants") & 12–13 ("Plaintiffs have not had the opportunity to conduct discovery on (1) the genesis of the raid-inspections, (2) whether the policy of targeting African-Americans–owned barbershops was recently enacted, (3) whether the City has used similar raid-inspections on other types of business establishments, and (4) evidence regarding a pattern or practice of defendants conducting joint raid-inspections with the Board or Code Enforcement")). In essence, plaintiffs seek an opportunity to further flesh out the factual details before a decision is made.

Given the serious possibilities raised by the allegations now in the complaint that such a policy or practice *may* exist, and given that the evidence needed to properly allege that fact one way or the other rest largely in the hands of defendants, the Court at this time will hold in abeyance ruling on those portions of defendants' motions seeking to dismiss the third, fourth, and fifth claims as well as the prayer for injunctive relief for the next ninety (90) days while the parties engage in jurisdictional discovery related solely to whether it can be established that these raid-style inspections of local barbershops in Moreno Valley are part of some policy or program of the City, County, and/or the Board.[5]

---

**5.** Defendants response to plaintiffs request for jurisdictional discovery request is confused. They argue that somehow the discovery that the Court will allow to proceed would only concern plaintiffs' injuries and damages from the 2008 search, so that none of the evidence unearthed during the process "can show likely future actions by defendants or future injury to plaintiffs." (Reply at 7). Such a contention misses the mark of what would be the proper scope of such discovery. It most certainly would not solely be about what injuries or damages plaintiffs' suffered as a result of the April 2, 2008, searches, but instead will focus on *defendants* and any and all policies or practices they have in place, and the nature of the inspections defendants have engaged in both prior to and after the alleged inspections in the Complaint. Defendants' fall-back position—that no discovery should proceed because plaintiffs have failed to pres-

Upon the completion of this jurisdictional discovery, the parties are thereafter directed to schedule with the Court an evidentiary hearing at which each side will be allowed to present evidence disclosed during the discovery process on the question. *Cf.* MOORE'S FEDERAL PRACTICE § 101.35 at 101–27 (noting that courts are permitted to hold evidentiary hearings before rendering final decision on standing).

### B. *Equal Protection*

■ Two things need to be shown to state a race discrimination civil rights claim: The act or conduct complained of must have had a discriminatory impact, and that the discrimination was intentional.[6] *See Washington v. Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

#### 1. *Discriminatory Impact*

■ Citing that "five of the six barbershops ... selected as targets for [these] raid-style inspections on April 2, 2008, were owned, operated, and primarily frequented by African Americans," (First Am. Compl. ¶ 4), plaintiffs have alleged that in using such "unusually aggressive" raids on their businesses the decision to do so was made "on the basis of [their] race and the race of the owners, employees, and clientele at [their] businesses." (*Id.*)

Defendants argue that discriminatory impact cannot be shown from such a statistical analysis because its focus is confined solely to what happened on April 2, 2008, which it is argued is "too narrow a time period" to establish liability. For this proposition, defendants cite to *United States v. Bourgeois,* 964 F.2d 935, 940 (9th Cir.1992), where the Ninth Circuit turned aside a *selective enforcement* defense raised by a criminal defendant (who noted that of the 100 or so people arrested during the sweeps only ten were prosecuted for firearms violations and all ten were African American) picked up on a firearms violation after a two-day, multi-district sweep of suspected gang members. *Id.* (where defense put forward was "that the government could as readily have identified and prosecuted non-blacks for firearms violations" but instead "for this operation, the government appears to have investigated gun stores in predominantly black neighborhoods and otherwise identified black, but not non-black felons who purchased guns"). As explained by the Ninth Circuit there was simply no showing by the criminal defendant in that case that the government "does not generally prosecute felons of all races who possess firearms." *Id.* To focus simply on one investigation could tend to distort what would otherwise be a neutral application of the law:

> As a policy matter, Bourgeois' narrow time focus is untenable. If adopted, it would severely limit law enforcement efforts directed at specific groups of criminals. As both parties note, many gangs and criminal groups are racially homogeneous. Operations targeted at Wall

---

ent *any* evidence that may indicate ongoing misconduct—is again refuted by the Code Enforcement official's comment and the fact that similar such raids had taken place prior to those on April 2, 2008. Admittedly, such "facts" are not enough by themselves to warrant a finding of standing, but they are certainly suggestive enough that such a policy or practice may indeed exist as to warrant permitting discovery on that issue before making a final decision.

**6.** The same analysis applies to equal protection claims, like here, brought under California's state constitution, Cal. Const., Art. I, § 7, as under the United States Constitution. *See Barnes–Wallace v. Boy Scouts of America,* 275 F.Supp.2d 1259, 1281 (S.D.Cal.2003). Accordingly, the Court's analysis of federal precedent applies equally to the merits of plaintiffs' state equal protection claims.

Street bankers, alien smugglers, or any of the gangs listed by Bourgeois ... are likely to result in the prosecution of several people of the same race. This, in itself, does not suggest the prosecution decisions were based on race.... The government need not provide discovery on a selective prosecution claim simply because law enforcement officials focused for a short time on a racially homogeneous criminal group[, rather such concerns are raised] by long-term targeting of one gang to the exclusion of others whose members are equally culpable and apprehensible.

Defendants' reliance on this case is misplaced. To begin, plaintiffs' discrimination claim is *not* one centered on the selective enforcement of the laws (the issue addressed in *Bourgeois* ); such would be the case if a complaint was raised that health and safety inspections that are "generally" done or permitted at barbershops were being exclusively conducted at African–American owned establishments. Instead plaintiffs' racial discrimination claim is based on the allegation that the manner and form of the *particular* inspections conducted at their establishments were well-outside the norm from those administrative inspections defendants had "generally" conducted in the past at other barbershops.[7] As ably explained by plaintiffs' counsel: "[Defendants] paint a distorted picture of plaintiffs' claim, erroneously asserting that it arises solely from the fact that defendants selected plaintiffs for ordinary business license inspections, not from the fact that defendants targeted plaintiffs for these *unusually* aggressive searches. However, the complaint could not be clearer that plaintiffs' discrimination claim is based not just on the fact of the searches, but on the unusually aggressive manner in which they were executed." (Opp. at 9 (emphasis added)).

Thus to require some longer time span for comparison with other typical health and safety inspections conducted at barbershops in Moreno Valley is both equally misguided and unilluminating. The atypical nature and manner of the inspections at issue places this case well beyond the confines of selective enforcement cases typified by *Bourgeois,* all of which are predicated on targeted enforcement of otherwise generally applicable criminal laws against a particular group. Again, in *Bourgeois* the conduct complained as discriminatory (the enforcement of federal firearms statutes) occurred regularly, such that consideration of racial disparities in the performance of the conduct across a longer time frame would be more instructive than taking what occurred in the enforcement of the law in isolation on a single day or a single operation would provide. As conceded by plaintiffs, "[i]f the only discriminatory treatment plaintiffs alleged had been that they were visited by Code Enforcement for ordinary inspection, [defendants] might rightfully argue that they could not allege discrimination on the basis of a single day's inspections, and must look to the pattern of ordinary Code Enforcement inspections over a longer period of time. But plaintiffs focus on the

---

7. Defendants' contention that the complaint cannot be read as alleging that law enforcement and inspectors did not treat other businesses in this fashion is mistaken. (Defs' Reply at 5 ("Plaintiffs are essentially asking the Court to cure this deficiency in the pleadings by inferring an allegation of discriminatory treatment from their characterization of the inspections as 'unusually aggressive' ")).

Again reading paragraphs 3 and 24 in the complaint together clearly indicates that "the search" conducted on April 2, 2008, "was more extensive and intrusive than" had been used in "any ordinary business inspection" to "determine compliance with barbering or business regulations." (First Am. Compl. ¶¶ 3, 24). That is all that is needed for the inference to take shape.

single day of inspections because, as alleged in the complaint, the businesses visited that day were subjected to 'unusually aggressive ... raid-style inspections'...." (Opp. at 11). Again, a fair reading of plaintiffs' complaint demonstrates that one of the central allegations therein is that these "raid-style" inspections had not been used on any other barbershops in the past (save for Fades Unlimited) except at by and large African–American owned barbershops.

## 2. Discriminatory Intent

This leads to the question of the sufficiency of the allegations in the complaint for establishing discriminatory intent. Here, there is more than the disparate impact (namely, that five out of the six establishments hit by these inspections were owned and frequented by African Americans); here there is the additional allegation that these inspections were more intrusive than those that had previously been conducted by the agencies involved. It is this additional fact—the "unusually aggressive" or intrusive nature of the inspections themselves (the contours of which are recited in great detail in the complaint, *see* First Am. Compl. ¶¶ 24– 28)—from which it is argued by plaintiffs that it can be inferred that there was a discriminatory intent in performing the inspections, the inference presumably being that defendants engaged in a form of racial profiling of African American barbershops perceiving them as somehow a den of criminal activity simply because they are owned and frequented by African American men.[8]

Defendants argue that such a factual allegation is insufficient to sustain an equal protection claim because, even if the allegation is taken as true, it "does not make out a plausible, as opposed to merely possible, equal protection violation." (Mot. Dismiss at 1). That gradation in likelihood is considered all-important to defendants because of recent Supreme Court case law on what constitutes a sufficiently plead factual allegation to survive a Rule 12(b)(6) motion to dismiss. *See Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

In *Iqbal* the Supreme Court set forth a two-pronged approach by which courts were to review the sufficiency of allegations in a complaint. First, a court reviews the complaint and discounts any allegations therein that amount to little more than "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." 129 S.Ct. at 1949. A complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Next, the court examines the remaining allegations to determine whether they "state a plausible claim for relief," with the understanding that such allegations are accepted as being true and any reasonable inferences that arise therefrom are to be accorded in the pleader's favor. *Id.* at 1950. A claim is plausible, as opposed to merely possible, if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the miscon-

---

**8.** Plaintiffs argue that the one other non-African American barbershop could have been searched by "mistake, convenience, or an attempt to cover-up discriminatory intent or other unlawful purpose." (Opp. at 8). Given that plaintiffs need not prove that the search "rested solely on racially discriminatory purposes," *Village of Arlington Heights v. Metro.*

*Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), defense counsel's notation that one non-African American barbershop was also subjected to these raid-style inspections is not as probative, *see infra,* of the plausibility of their proffered alternative explanation. (Def's Reply at 2–3).

duct alleged." *Id.* at 1949. In contrast, a complaint alleging facts that are "merely consistent with a defendant's liability, stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

Thus, in *Iqbal*, the Supreme Court found the plaintiffs' allegation that the "arrest[ ] and detention [of] thousands of Arab Muslim men ... [by the federal government] as part of its investigation of the events of September 11, 2001" could not plausibly infer purposeful unlawful discrimination on the government's part because an "obvious alternative explanation" existed: Given that the mastermind and perpetrators of the September 11th attacks were Arab, "a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims." *Id.* at 1951. Nor did the plaintiffs' allegation that, after being arrested, the government placed them in highly restrictive conditions of confinement sufficiently infer a discriminatory intent as such an action could be plausibly explained in a non-discriminatory manner: That "the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity." *Id.* at 1954.

■ Seizing on this, defendants' position is succinctly stated, "plaintiffs' complaint contains allegations that raise an obvious lawful alternative explanation for the searches, *i.e.,* that plaintiffs' permitted their barber shops to be used as social gathering places, a potential violation of the health and safety statute governing barber shops and potential violation of business licensing requirements." (Mot. Dismiss at 1–2). As rephrased by defen-

dants: "Plaintiffs barbershops were selected for inspection not ... because their patrons were African American but instead ... because the shops' use as social gathering spots—including the use of back rooms for card and domino playing—violated" the state licensing law. (Mot. Dismiss at 10–11). The exact provision of the state licensing law for barbershops defendants point to is California Business & Professional Code § 7350, which makes it a misdemeanor "to permit any room or part thereof" in a barber shop "to be used for residential purposes or for any other purpose that would tend to make the room unsanitary, unhealthy or unsafe, or endanger the health and safety of the consuming public."

This "explanation" is simply wrongheaded. Nowhere do defendants even bother to explain how the fact that a barbershop, even one known as a "social gathering place." [9] would somehow serve as a legitimate explanation justifying why 5 out of 6 "raid-style" inspections conducted on April 2, 2008, were on establishments run and frequented by African Americans. To begin, it is not clear how having a good conversation about topics of the day (as is typified by a "social gathering place"), or partaking in a friendly game of cards or dominoes, somehow amounts to a violation of § 7350 (is talking to friends or playing dominoes considered "unsanitary" or "unhealthy"?).

Even setting that aside, these "inspections" were not typical ones (as again alleged in the complaint), but were of a variety more akin to those conducted during criminal sweeps. Defendants cannot offer as an "alternative plausible explanation" for why there is such a great disparity in African American barbershops (with no prior history of violence) being subject-

---

9. The Court is unaware of any barbershop that, one some level, is *not* also a "social gathering place." Such has always been the nature of barbershops.

ed to this atypical form of administrative searches simply on the fact that businesses involved were barbershops which are notoriously "social gathering" places. There is simply a disconnect between the proffered explanation and what is alleged to have occurred; a disconnect that renders their alternative explanation for the disparity as anything but "plausible," let alone "obvious." As ably remarked by plaintiffs' counsel: Even if "the social aspect of these African American barbershops somehow justified a routine inspection to insure compliance with barbering or business regulations, it would not explain why defendants did not simply conduct such routine inspections, but instead subjected plaintiffs' shops to raids so aggressive" as that alleged in the complaint. (Pls' Opp. at 14).

The only other alternative explanation proffered by defendants is that the particular racial-makeup of the barbershops subjected to these "raid-style" inspections are simply a reflection of the fact that many of the barbershops in the particular part of Moreno Valley that was subjected to these raids were owned and operated by African Americans, not a reflection of defendants' discriminatory intent. As defense counsel explains: "[T]he shops in that geographical area may happen to be primarily owned, owned, operated by, or frequented by African Americans, and thus those were the shops that were involved in the licensing sweep of that geographical area." (Def's Reply at 2). The problem with this "explanation" is that it is predicated entirely on an argument of counsel, not facts alleged in the complaint. There is no mention in the complaint as to the relative proximity to which each of the affected barbershops were to one another, nor does even defense counsel's "explanation" seek to proffer one. Where the barbershops affected all located within a two mile radius, a six mile radius, or something larger? Without these key additional facts, the Court cannot even begin to entertain the

obviousness, much less the plausibility, of this alternative explanation. Moreover, this explanation completely ignores the fact that these special raid-style inspections had been conducted on two prior occasions before the ones on April 2, 2008, and each time those earlier inspections were done solely at an African American barbershop, Fades Unlimited. If the impact of these raid-style inspections is attributable solely to the peculiar makeup of the barbershops in the geographical area (yet undefined) in which they took place on the date in question, no explanation exists as to why it is *only* in this particular area that these special inspections are conducted nor why in the eight times in which the inspections had been performed (including those from late 2007 and early 2008) seven of the inspections occurred at barbershops solely owned and operated by African Americans?

█ Counsel for the individual Code Enforcement inspectors next argue that, should any "discriminatory intent" be betrayed by the allegedly atypical nature of the inspections conducted on April 2, 2008, then such intent cannot be imputed to them because those acts were alleged to have been committed solely by MVPD officers or higher ups within the agencies. As to the former point, defense counsel has not read plaintiffs' complaint closely enough. At one point in the complaint it is alleged that "the unusually aggressive conduct of the MVPD during the raid-style inspections" demonstrated that decisions "to target these businesses in the manner they did was based, in part or in whole, on the race of the barbers and their clientele." (First Am. Compl. ¶ 4). Defendants argue that this single allegation "is consistent with the rest of the complaint, which attributes all the allegedly aggressive conduct during the ... administrative inspections to the MVPD" with the Code

Enforcement and Board inspectors' conduct simply limited to tagging along and "accompanying" the MVPD during the inspection. (Defs' Reply at 5, 7). That is simply inaccurate. Elsewhere in the complaint, when speaking of the particular practices used during these inspections themselves that rendered them "unusual," it is alleged that such conduct was committed by "the MVPD, Code Enforcement, and Board officers." (First Am. Compl. ¶ 24 ("For approximately one-half hour, the MVPD, Code Enforcement, *and* Board officers conducted an extensive search of the Hair Shack, *including areas where no barbering was performed, and questioned employees and customers*" (emphasis added)) & ¶ 25 ("Officers *and* inspectors conducted an extensive search of the shop [at Fades Unlimited that] was more intrusive than necessary to determine compliance with barbering or business regulations" (emphasis added))). Given that there are specific allegations alleging that Board and Code Enforcement inspectors engaged in the "unusual" aspects of the inspections and that these inspections were conducted almost entirely at African American barber shops (and which had not been conducted against other businesses in the past, save for Fades Unlimited), the Court finds that the allegations in the complaint are sufficient that they *could* betray a discriminatory intent on the inspectors part.

The problem, however, is that there is *no* indication in the complaint that it was the individual inspectors who made or participated in the decision to so target the African American barbershops in question. Indeed, it is equally possible (and perhaps more likely) that the individual inspector's "participation" in the process was limited to simply being given instructions by their superiors to accompany MVPD officers to pre-approved, designated places to inspect; the where, when, and who would be inspected (and the manner of the inspection)

being out of their hands. As noted by defendants, the complaint alleges that the decision to "approve" conducting the raid and which barbershops to inspect was done by "*supervisors*" at Code Enforcement, MVPD, and/or the Board, (First Am. Compl. ¶ 35), a position which none of the individual Code Enforcement inspectors held. Moreover, it is alleged that "MVPD officers," not anyone from Code Enforcement or the Board, "initiated" and "requested" this joint operation in the first instance. (First Am. Compl. ¶ 3). From this, the individual defendants argue that since they did not "make" the decision as to which barbershops to conduct the raid on or the nature of any inspection that was to be conducted, no discriminatory intent can be imputed to them. Defendants' argument is persuasive.

Although at the pleading stage a plaintiff need only "allege facts that are at least susceptible of an inference of discriminatory intent," *Byrd v. Maricopa County Sheriff's Department*, 565 F.3d 1205 (9th Cir. 2009), nothing in the allegations pled in the complaint are susceptible to the inference that the individual inspectors (to be distinguished from the individual MVPD officers) having a racially discriminatory intent. This is perhaps best illustrated by the bit of fine-splitting of language on plaintiffs' part in attempting to show such an inferences given the allegations in the complaint. Plaintiffs argue that the section of the complaint cited to by defendants only said the decision to "approve" the raid, how it was carried out, and which businesses to inspect was done by "supervisors," but that it nowhere alleged who "made the decision" on the particulars that were subsequently "approved." (Pls' Opp. at 14–15). This factual gap thus leaves the possibility that perhaps the individual inspectors had some input in that regard (as is, at least, explicitly suggested in the complaint with regards to the MVPD officers

who "initiated" and "requested" the inspections in question). As stated by plaintiffs: "Approving the decision is not the same as making the decision, and it certainly is not the same as carrying out the raids. This allegation does not suggest that [defendants], who did carry out the raids, did not participate in decisions about what businesses to target or in what manner to conduct the raids, and it certainly does not absolve them for 'acting in conjunction' to execute the raids." (Opp. at 14–15).

That may be true, but by the same token there is no allegation in the complaint (nor can one be inferred from those allegations made) that these individual defendants participated in making that decision. The allegation that the inspections were initiated at the request of MVPD officers, in conjunction with the one that even touches upon the subject in question (namely, that "superiors" at the various agencies "approved" the operation, including the nature of the inspections and which businesses were targeted), would actually tend to point in the opposite direction—that the individual inspectors played no part in the decision-making process with respect to these "raid-style" inspections. There must be *some* evidence of discriminatory intent and that is precisely what is missing here.

Counsel for defendant Underwood, the Executive Officer of the Board, correctly observes that there is no allegation in the complaint that Board inspectors or the Board itself were involved in or even apprised of the inspections conducted at Fades Unlimited in late 2007 and early 2008. Nonetheless, such allegations are manifest with respect to the April 2, 2008, inspections. Defendant Underwood demurs on that point as well, arguing that "none of these allegations are directed at" her. (Mot. Dismiss at 8). Put simply, Underwood's counsel seeks to characterize the locus for any discriminatory intent attached to the inspections as entirely local in origin, with the Board (notably at the level in the agency in which she sits) as a peripheral player with no input in the process from which an inference of discriminatory intent could be made. For this reason Underwood's counsel cites to a Ninth Circuit case, *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir.1996), that applied traditional tort law to a civil rights claim for the proposition that an intervening cause that breaks the chain of proximate causation defeats any finding of liability; here, it is argued that it was the local officers and agencies that infused any discriminatory intent in an otherwise content neutral inspection regimen.

That, however, is not how the complaint is pled. As noted above, it is alleged that "supervisors" at the various agencies, including the Board, "approved in advance" not only the "manner in which the raids would be conducted" but also "which businesses would be selected for raid." Underwood, given her position within the agency, would clearly fall within the category of a supervisor. To equate Underwood's "approval" as little more than signing off on "inspections [that] take place" all the time "to ensure compliance with the Barbering Act," (Mot. Dismiss at 9), is only possible if done to the *exclusion of other allegations to the contrary made in the complaint.* Thus, the Court need not entertain the question left outstanding in another Ninth Circuit case, *Liston v. County of Riverside*, 120 F.3d 965, 981 n. 13 (9th Cir.1997), about "the extent to which" an individual's act in "obtaining ... the warrant could result in liability for any unlawful acts of officers who executed it"; here, it is alleged that a supervisor in a position similar to Underwood's signed off on the particular method in which the inspections were carried out and businesses that would be inspected.

The Court therefore concludes that, as presently alleged, the complaint is insufficient to state a claim that the individual inspectors had a discriminatory intent in carrying out the "raid-style" inspections and hereby **DISMISSES** the first claim in the complaint against the individual Code Enforcement inspectors—defendants Heisterberg, Longdyke, and Miller—and the individual Board inspectors—defendants Joe Brown, Xochi Camargo, and Arlene Bauby. However, because the defect in the complaint can apparently be cured through further amendment, the Court hereby affords plaintiffs leave to amend their complaint within thirty (30) days of the date of this Order to more precisely address the issue of whether (and, if so, how so) the listed individual defendants participated in the decision making process leading to the implementation and conduct on the raid-style inspections in question.[10] In all other respects, defendants motions to dismiss plaintiffs' federal and state equal protection claims is **DENIED.**

### C. Reasonableness of Raid–Style Inspections

Beginning with the passage of the Barbering and Cosmetology Act of 1939, California has established a statutory and regulatory scheme for barbershops directed to health and safety issues; included among that scheme is the ability of code enforcement and state inspectors to subject those establishments to warrantless administrative inspections to ensure that compliance to the regulations is met. See Cal. Bus. & Prof Code §§ 7301–7444.1, and the regulations promulgated thereunder, Title 16, division 9, §§ 901–999. The Board oversees the licensing and discipline of barbers, cosmetologists, and barbershops; only licensed professionals may practice barbering and cosmetology. See Cal. Bus. & Prof.Code § 7317. The Board also issues "establishment" licenses to barbershops, with an "establishment" defined as any premises, building or part thereof, where an activity licensed by the Board is practiced. See Cal. Bus. & Prof.Code §§ 7346–7347. An establishment must always be

---

**10.** Defendants argument on qualified immunity built entirely on the Ninth Circuit's decision in *Bourgeois* is unconvincing. (Defs' Mot. Dismiss at 14) ("While it may have been apparent at that time that local governments may not selectively enforce the law against certain citizens because of their race, it certainly was not clear that law enforcement actions conducted on a single day which disproportionately affect persons of a particular class could ... constitute an equal protection violation"). As noted earlier, the *evidence* (as opposed to whether a constitutional *right* has been violated) required to sustain a defense of selective enforcement borrowed from criminal law is, and has been found by other courts before 2008, to be inappropriate for civil rights actions such as that brought by plaintiffs. Moreover, however defendants seek to partition the acts underlying this case (and it must be remembered that the raid-style searches conducted on April 2, 2008, were *not* the first time such inspections had been conducted), as being factually distinguishable from other cases, it has long been established that targeting African Americans (however, couched, be it as racial profiling or something else) for unusual law enforcement programs is itself illegal. See *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948–49 & n. 9 (9th Cir.2003) (articulating constitutional standard applicable to equal protection claims concerning racial profiling). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful"; sometimes the unlawfulness of an act is "apparent" even "in light of" general principles in "pre-existing law." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances" as even "general statements of the law are not inherently incapable of giving fair and clear warning." *Id.* at 741, 122 S.Ct. 2508. That the defendants allegedly sought to conduct racial profiling for just *one* day or several months does not alter the unlawfulness of the alleged action itself.

under the charge of an individual licensed by the Board and all individuals providing professional services at the establishment (save student interns) must be licensed. *See* Cal. Bus. & Prof.Code §§ 7348–7349. The Barbering Act also provides that the Board shall engage in random and targeted inspections of establishments to ensure compliance with applicable laws relating to public health and safety and the conduct and operation of licensed establishments. Cal. Bus. & Prof.Code §§ 7313, 7353. Finally, a laundry list of regulations have been promulgated concerning the minutiae of things that take place at barbershops, including mandatory minimum equipment and tools for disposal of hair and used clothes, use of disinfectant and disposal of items between patrons, and the storage of liquids, creams, powders, and cosmetics. *See* 16 Cal.Code Regs. §§ 978 (minimum supplies), 979 (disinfecting equipment), 981 (instruments and supplies), 983 (personal cleanliness), 985 (neck strips), and 987 (towels).

Plaintiffs do not dispute that barbershops in California are a "closely regulated" businesses, nor that the warrantless inspections authorized thereunder vindicate an important state interest, namely, public health and safety. (Pls' Opp. at 12 ("plaintiffs do not contest here" that the "business [was] closely regulated by a statutory scheme, and that the scheme [was] informed by a substantial government interest")); *see also Stogner v. Commonwealth of Kentucky,* 638 F.Supp. 1 (W.D.Ky.1985) (holding that the pervasiveness of the regulatory scheme created by Kentucky's Barbering Act, which is similar in many respects to California's, rendered the barbering business subject to close government supervision so as to lower an owner's expectation of privacy thereto). However, even starting with that as a given does not end the inquiry. *See New York v. Burger,* 482 U.S. 691, 702, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) ("where

the privacy interests of the owner are weakened and the governmental interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises *may well* be reasonable within the meaning of the Fourth Amendment" (emphasis added)).

■■■■■■■ Warrantless inspections of such closely regulated businesses that seek to vindicate a substantial state interest must still meet other criteria for them to be considered constitutionally reasonable. Notably, the inspection program put in place by the regulatory scheme "must provide a constitutionally adequate substitute for a warrant." *Id.* at 703, 107 S.Ct. 2636. As explained by the Supreme Court, such a substitute exists if "the regulatory statute ... advise[s] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it ... limit[s] the discretion of the inspecting officers." *Id.* In order to adequately cabin the inspector's discretion, the regulatory scheme "must be 'carefully limited in time, place, and scope.'" *Id.* (quoting *United States v. Biswell,* 406 U.S. 311, 315, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972)).

It is on this last question concerning the breadth of discretion conferred by California's barbershop regulatory scheme, and whether the conduct of the officers and inspectors in carrying out the raid-style inspections exceeded that discretion, that the parties diverge.

Plaintiffs do not seriously dispute that the California Barbering Act and the regulations promulgated thereunder informs the operator of a barbershop "that inspections will be made on a regular basis" so as to leave little doubt that, when such inspections occur, they "do not constitute discretionary acts by a governmental official but are conducted pursuant to statute." *Id.* at 711, 107 S.Ct. 2636. Section

7313(a)(1) of the Barbering Act authorizes inspectors and other authorized representatives to "have access to" and allows them to "inspect any establishment ... during business hours or at any time in which barbering ... [is] being performed." To that end, section 7313(a)(2) requires that the Board "maintain a program of random and targeted inspections of establishments to ensure compliance with applicable laws relating to the public health and safety and the conduct and operation of establishments."

Nor can it seriously be questioned that the barbershop regulatory scheme places appropriate restraints on the inspector's discretion, at least insofar as the time and place for the inspections. Again, the statute allows inspections to be conducted only "during business hours" or when "barbering ... [is] being performed" on the premises. *See Burger*, 482 U.S. at 711, 107 S.Ct. 2636 (observing that statutory bar on inspection occurring outside "the regular and usual business hours" was a sufficient limitation on the time in which an inspector could conduct an inspection). Likewise, such inspections can be made only at the barbershops themselves. *Id.* (holding that limitation of inspections to areas of "vehicle-dismantling and related industries" pursuant to an administrative scheme regulating automobile junkyards sufficiently circumscribed inspector's discretion on place to inspect). This then leaves whether there are sufficient limitations on the scope of the inspections conducted pursuant to the regulatory scheme, and if so, whether the raid-style searches conducted by defendants are within that authorized scope.

Plaintiffs argue that California's Barbering Act "sets forth no limitations on the scope" of the inspections it authorizes, including "the manner in which they are conducted or how businesses may be chosen for 'targeted inspections.'" (Opp. at

13). The Court is not entirely convinced. The statute provides that inspections are to be done "to ensure compliance with applicable laws relating to the public health and safety and the conduct and operation of establishments"; namely, the lengthy laundry list of statutory and regulatory provisions covering everything from the licensing of barbers to the minutiae of day-to-day tasks at barbershops. The statute directs inspectors to "inspect establishments to reasonably determine compliance levels." Such statutory provisions would appear to limit the purpose of the inspection and the limit of that task. *See Biswell*, 406 U.S. at 312 n. 1, 92 S.Ct. 1593 (finding regulatory provisions of the Gun Control Act limiting inspection to records and inventory sufficiently confined inspector's discretion as to scope of inspection); *Burger*, 482 U.S. at 711–12, 107 S.Ct. 2636 (finding that limitation on the scope of the inspection to "the records, as well as 'any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises'" adequately cabined inspector's discretion). Admittedly, the regulatory scheme does not tie (as in the cases cited) the inspection to particular items (however broadly classified) to be searched; instead, the scope of the inspection that is permitted is made co-extensive with the purpose of the regulatory scheme itself; that is, to ensure compliance with the myriad of statutory and regulatory provisions that put in place to promote health and safety and the proper operation of the establishments. The Court, however, need not resolve this issue, as there is a more obvious constitutional problem with the inspections.

■ Even if a regulatory scheme provides a constitutionally adequate substitute for a warrant, the inspections (like any search be it authorized by a warrant or otherwise) that are actually conducted pur-

suant to that scheme must still meet "the Fourth Amendment's standard of reasonableness." *United States v. Bulacan,* 156 F.3d 963, 967 (9th Cir.1998); *see also Lewis v. McMasters,* 663 F.2d 954, 955 (9th Cir.1981) (observing "[a] constrained interpretation of [the provisions of the statutory scheme] is mandated" on account of the "limited exception to the Fourth Amendment warrant requirement for inspections of 'pervasively regulated businesses' All of these cases have recognized the importance of placing reasonable time, place and manner requirements on the inspections. Indeed, in *Colonnade* [*Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) ], the Court, while it upheld the inspection statute involved, struck down the particular search because it exceeded the bounds of the authorizing statute").

■ Thus, to pass constitutional muster, the manner and method in which the inspection is carried out must be sufficiently tailored to the "administrative goals" and "purposes" animating the regulatory scheme giving rise to the inspection itself. *See Bulacan,* 156 F.3d at 967 ("To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it"); *cf. Burger,* 482 U.S. at 715–16, 107 S.Ct. 2636. Thus, in *Lewis,* the Ninth Circuit held that the seizure, removal, and subsequent search of a steel drum filled with metal parts during an administrative inspection of a automobile dismantling yard (authorized by a vehicle registration statutory scheme) was constitutionally unreasonable as it "exceed[ed] the permissible scope of the statute." 663 F.2d at 955. It is this principle that plaintiffs argue was transgressed with the raid-style inspections as defendants "failed to tailor the scope of the administrative inspections to the particular health and safety concerns" underlying the barbering regulatory

scheme. *Donovan v. Dewey,* 452 U.S. 594, 601, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). Notably, it is asserted that the method of the inspections, places that were searched, the people that were questioned, and the information sought during these raid-style inspections went well beyond the basic health and sanitation concerns expressed in the Barbering Act and regulations. (Opp. at 15).

Defendants' response is not convincing. Defendants are correct that there is nothing unreasonable *per se* about the presence of police officers during the inspections themselves; police departments are the only agencies that can cite individuals with a misdemeanor for the unlicensed practice of barbering. *See* Cal. Bus. & Prof.Code § 7317. But that fact does not address the particular point being raised by plaintiffs—that it was how the inspections were carried out that went beyond the scope of what was permitted under the regulatory scheme. Defendants protest that "there are no facts to support the implication that the search was an effort to uncover criminal activity other than unlicensed practice." (Def's Reply at 9). That assertion, however, is simply not in keeping with the allegations contained in the complaint. If this were little more than a sweep directed to ferreting out individuals practicing barbering without a license (a minor misdemeanor, at best), then why were "warrant checks" performed at some of the establishments (First Am. Compl. ¶ 25); why did police enter the establishments wearing bulletproof vests and carrying firearms (First Am. Compl. ¶¶ 3, 24); why did areas outside those where barbering was performed inspected (First Am. Compl. ¶ 24); why were *customers* questioned and their identification requested (First Am. Compl. ¶¶ 3, 24, 25); and why was access to and from the barbershops themselves

blocked?[11] (First Am. Compl. ¶¶ 24, 25). All of these allegations, taken together, bear the tell-tale signs of a general criminal sweep for crimes much more serious than the unlicensed practice of barbering, and certainly more than is needed to catch violations of such mundane matters as the storage of towels, use of disinfectants, or the cleanliness of the barbers themselves. None of these factual allegations are confronted by defendants. Instead, they are ignored in favor of making broad-based conclusory statements that "plaintiffs have not alleged facts to reflect that the Board's inspection went beyond that permitted by the Barbering Act" and that "the facts" alleged "would not make the inspection constitutionally unreasonable." (Def's Reply at 9–10).

Defense counsel for the Board's final argument is that none of these allegations concerned (or was alleged to have concerned) conduct done by Board inspectors; rather, those individuals it is argued were alleged to have done little more "than routine inspections." (Def's Reply at 10). Far from it. As noted in the earlier section concerning plaintiffs' equal protection claims, it is alleged in the complaint that, at the Hair Shack, "the MVPD, Code Enforcement, *and* Board officers conducted an extensive search ..., including *areas where no barbering was performed, and questioned employees and customers.*" (First Am. Compl. ¶ 24 (emphasis added)). No parsing out between the conduct of MVPD officers and inspectors from the Board (or Code Enforcement) is made. Instead, the complaint lumps all three together as having conducted and participated in the "extensive searches" in question, including the egregious aspects noted earlier by the Court (*e.g.*, inspecting areas where no barbering was performed a reference perhaps to the backroom at the Hair Shack and questioning customers).

In light of these allegations, the inadequacy of the proffered rationale for how the inspections were carried out (as alleged), and the disconnect between the same and the administrative purpose for such inspections to begin with, the Court concludes that plaintiffs have sufficiently pled a claim that the inspections were constitutionally unreasonable. Accordingly, defendant's motion to dismiss the fourth claim in the complaint is **DENIED.**[12]

---

11. The complaint alleges that the other "inspections conducted at the other African–American businesses on April 2, 2008, were conducted in a similarly invasive and intrusive manner." (First Am. Compl. ¶ 29). Defendants lone rebuttal to these allegations is that they concerned what transpired during the late 2007 and early 2008 inspections of Fades Unlimited by MVPD officers. (Def's Reply at 10). That is simply wrong. The allegations noted above all concern what took place during the inspections that were conducted on April 2, 2008, for which all class of defendants partook in carrying out.

12. Defendants further contend that, for purposes of plaintiffs' section 52.1 claim, the complaint does not allege any facts that would show that the Board engaged in any conduct involving threats, intimidation, or coercion. (Mot. Dismiss at 17). Such an assertion is mistaken. It is alleged that the

Board "approved" ahead of time the manner in which these raid-style inspections would be carried out and to that end it is alleged that MVPD, Code Enforcement, *and* Board inspectors worked together to prohibit access in and out of the establishments during the inspections; that when one barber voiced objections to the intrusive nature of the inspections he was handcuffed and temporarily detained in a patrol car; and that the MVPD officers who accompanied board inspectors in carrying out these inspections came dressed in their full regalia with bulletproof vests and displaying their firearms. Such acts, again allegedly approved by higher ups within the Board, is sufficient to show that any violation of plaintiffs constitutional rights that occurred was accompanied by threats and intimidation. *See Cuviello v. City of Stockton,* 2009 U.S. Dist. LEXIS 4896, at *56–57 (E.D.Cal. Jan. 23, 2009); *Cole v. Doe,* 387 F.Supp.2d 1084, 1103 (N.D.Cal.2005).

### III. CONCLUSION

To summarize, defendants' motion to dismiss the individual Code Enforcement and Board inspectors with respect to the first claim in the complaint is hereby **GRANTED** but with plaintiffs afforded leave to amend their complaint within the next thirty (30) days, and in all other respects defendants' motions to dismiss the federal and state equal protection claims in the complaint is **DENIED**; defendants' motion to dismiss the third, fourth, and fifth claims as well as the prayer for injunctive relief is held in abeyance pending the completion of jurisdictional discovery (which is to take place within the next ninety (90) days) and the holding of a evidentiary hearing; and defendants' motion to dismiss the fourth claim in the complaint is **DENIED**.

IT IS SO ORDERED.